963 A.2d 348

DIVISION OF YOUTH AND FAMILY SERVICES, PLAINTIFF–RESPONDENT, v. M.C. III, DEFENDANT–APPELLANT.

IN THE MATTER OF M.C. IV AND N.C., MINORS.

Superior Court of New Jersey
Appellate Division

Argued October 28, 2008—Decided December 31, 2008.

Before Judges WEFING, PARKER and LeWINN.

*Michael C. Wroblewski,* Designated Counsel, argued the cause for appellant (*Yvonne Smith Segars,* Public Defender, attorney; *Mr. Wroblewski,* of counsel and on the brief).

*Nancy R. Andre,* Deputy Attorney General, argued the cause for respondent (*Anne Milgram,* Attorney General, attorney; *Melissa H. Raksa,* Deputy Attorney General, of counsel; *Renard L. Scott,* Deputy Attorney General, on the brief).

*James A. Louis,* Deputy Public Defender argued the cause for minors M.C. IV and N.C. (*Yvonne Smith Segars,* Public Defender, Law Guardian, attorney; *Olivia Belfatto Crisp,* Assistant Deputy Public Defender, on the brief).

The opinion of the court was delivered by

LeWINN, J.A.D.

Three orders form the subject of this appeal by defendant M.C. III, the natural father of M.C. IV, born April 25, 1991, and N.C., born July 14, 1993:(1) the order of December 15, 2006, entered after a fact-finding hearing, holding that the Division of Youth and Family Services (DYFS) had established by a preponderance of the evidence that defendant had physically abused the children; (2) the order of February 8, 2007, granting custody of M.C. IV to his step-sister, N.A., under a non-dissolution docket pending in the Family Part, and continuing custody of N.C. with DYFS pending her release from a juvenile facility; and (3) the order of November 28, 2007, terminating the abuse and neglect litigation. Because we conclude that the evidence presented during the fact-finding hearing conducted on December 15, 2006, was insufficient to support the determination that M.C. III abused or neglected his children,

we reverse the orders of December 15, 2006 and November 28, 2007, and remand for further proceedings.[1]

## I.

The pertinent factual background may be summarized as follows. M.C. III was divorced from the children's natural mother, T.C., in 1999 and was awarded custody of M.C. IV and N.C. because of T.C.'s severe mental disorders. The incident giving rise to the orders on appeal occurred on September 24, 2006. Defendant testified that, on that date, the children were upset because he had limited their use of the computer for internet access. Defendant further testified that the children began saying they were like "guests" in the house. As a means of disciplining them for what he considered disrespectful behavior, defendant ordered each of the children to write a 500-word essay stating that they were not guests in their own house.

M.C. IV attempted to use the computer to complete his essay, by typing "I will not say I'm a guest in my own [house]!" and then copying it 500 times. Defendant told his son he could not use the computer for this task and had to "do [it] by hand . . . as [he] always [had] done. . . ." M.C. IV became very upset and started shouting, "This is bull crap. . . ." The boy attempted to go upstairs, and defendant told him to come back down because he did not like the way M.C. IV was acting. Defendant acknowledged that he followed his son part of the way up the stairs and grabbed his shirt to pull him back down.

At this point, N.C. started cursing at defendant, telling him to "[g]et [his] . . . hands off [her] brother. . . ." Defendant said to N.C., "Oh, you want some[,]" meaning "[do] you want to get involved with this. . . ." He started towards N.C. who then ran towards defendant's bedroom. He testified:

---

[1] We concluded the order of February 8, 2007 must remain in effect pending final disposition of the remand proceedings to ensure continuity in the children's care and custody.

> By the time I got to the doorway of my bedroom ... [M.C. IV] had jumped on my back and had his arms around my neck, and it really startled me. So by him grabbing me, ... the way he jumped up on my back, ... threw me off balance, and as I fell, all three of us[,] [N.C.] was standing in front of me, we all fell on the bedroom floor.

Defendant stated that after they fell, "all three of us were on the floor ... and [M.C. IV] was trying to jump up around me. [N.C.] was trying to get up and I just held them down on the floor just to try to get them to calm down for a[ ]while." After defendant "let them get up," he "tr[ied] to get [M.C. IV and N.C.] to go upstairs, but they didn't want to go upstairs."

N.C. then picked up the phone and defendant said to her, "Go ahead. Call the police." Defendant testified that when the police arrived, he "explained to them everything that happened. There wasn't nobody hurt, cut, shot, bleeding or anything like that. They checked us out. [M.C. IV] had started cursing and one of the officers told him ... to stop being disrespectful, and [N.C.] ... was yelling."

Defendant testified that after the police left, "[N.C.] started yelling, 'I'm calling my sister and I'm getting out of here.'" Defendant told her to "[t]ake [her] behind upstairs...." Defendant also stated that at this time, "[M.C. IV] was getting ready to go out the door," and defendant told him, "No, you're not going nowhere.... You get your butt upstairs too."

According to defendant, neither child wanted to go upstairs, so he "blocked" the doorway. "I stood between the door and them so that they couldn't go anywhere. [M.C. IV] approached me a few times and I told him ... 'Get back.... Take your butt upstairs.'" However, M.C. IV kept approaching him, so defendant "pushed him back a couple of times...." At a point when defendant walked towards N.C., M.C. IV went outside.

Once outside the house, M.C. IV again phoned the police. The second time the police arrived defendant was in his truck getting ready to go to work. He observed "[o]ne of the officers ... talking to the kids outside." Defendant testified that "after a few minutes, I saw [the children] walk to the left, which [was] out of

my view. . . . [T]hat's the last that I saw of them. After that, I was already in my truck and then I just took off."

Daniel LaFountaine, the police officer who received both calls on September 24, 2006, testified that he went to defendant's house for the first time at 12:30 p.m., and the second time at around 1:00 p.m. On each occasion he spoke to the children. LaFountaine testified that the children told him there had been an "argument . . . about [M.C. IV and N.C.] being on the computer," and that "they were being beaten by [defendant]."

LaFountaine further testified that when he asked the children to point to where on their bodies defendant struck them, "[t]hey didn't point" but rather "[t]hey said all over." LaFountaine stated that the children did not show him any injuries, and that although he looked for injuries on them, he did not observe any. The officer further specified that he did not notice any bruises on N.C.'s right ear, or any swelling on M.C. IV's hand, and that "[M.C. IV and N.C.] had no injuries when [he] saw them last."

LaFountaine acknowledged that he did not have the children disrobe in order to view "other parts of their bod[ies] that were covered[.]" He explained that in order to request a juvenile to remove an article of clothing for examination, "we need[ ] consent from the other parent . . . [and t]here was no parent there other than [defendant]." LaFountaine further testified that as an alternative measure, when a second parent is unavailable to give consent, he could call DYFS, which he would do "if [h]e felt as though there was a danger to the children." The officer did not consider it necessary to call DYFS under the circumstances.

Rachel Still, a DYFS special response unit supervisor, first met M.C. IV and N.C. at approximately 8:20 p.m. on September 24, 2006, at Cooper Hospital in Camden, when she was contacted by staff physician Dr. Amy Lewis. Still testified that the children told her that after Officer LaFountaine left, they "ran from [defendant's] home and went to an aunt's house," and then "they contacted their mother, and they themselves got onto the

high[-]speed line and came into Camden where they met their mother and she took them to the hospital."

Still stated that M.C. IV told her the following: "[H]e was using the computer and ... [defendant] had told [him] to get off of the computer. As he logged off and got up and walked away and was going up the steps, [defendant] came behind him and grabbed him from behind and started punching on him." Still added that M.C. IV said defendant "grabbed him by the back of his neck."

Still testified that N.C. told her that

[d]uring that time frame [when defendant grabbed M.C. IV], [N.C.] got involved into the altercation as well and told [defendant] to get off of her brother, and [defendant] turned around and chased her ... into [defendant's] room ... where he began to punch and kick on her.

During Still's testimony, DYFS introduced into evidence a DYFS Screening Summary dated September 24, 2006. This document had been completed by DYFS screening worker Anthony Jimenez and screening supervisor Kerri Dickerson, neither of whom testified at trial. On one of the sheets, Dickerson wrote that Dr. Lewis said "she was told that [defendant] ... began to punch and strangle both children," during the "altercation."

Dr. Lewis had taken pictures of the children's injuries at the hospital. Still testified that Dr. Lewis thought that M.C. IV's hand was broken, "but it was not," and that N.C. "had some blood in her urine, which prompted [the doctors] to do [an] abdomen CAT scan," but "[N.C.] didn't have any injuries to her abdomen."

Dr. Lewis filled out medical examination forms provided by DYFS. These forms, which were also admitted into evidence, indicated that N.C. had "multiple soft tissue abrasions [and] contusions consistent with assault," and "2 abrasions," one behind her right ear and another on her left shoulder. The forms also stated that M.C. IV had a "soft tissue injury" on his right hand, a "scratch" on the right side of his neck and "swelling over [his] upper ribs." Dr. Lewis also wrote that M.C. IV had "multiple soft tissue abrasions [and] contusions consistent with assault."

Danielle Garwood, a DYFS intake worker, visited M.C. IV and N.C. in the "early afternoon" of September 25, and interviewed them regarding the incidents that had taken place the previous day.

Garwood testified that the children told her

that they got into a physical altercation with [defendant] over the computer, that ... [defendant] wanted [M.C. IV] to get off the computer. [M.C. IV] logged off and then [defendant] physically attacked him and [N.C.] jumped in to defend her brother. The police had responded twice. The second time the officer who responded told them that they were being immature and they just needed to deal with it. It was discipline.

When questioned whether she observed any bruising on either of the children, Garwood said she saw "[s]cratches, discoloration pink red [sic]."

At the conclusion of the trial, the judge stated: "I find the children to be abused and neglected children. I make this finding by a preponderance of the believable evidence." In support of this finding, the trial judge stated:

On the date in question, which was September 24th, the children had been on the computer. [Defendant] told them to get off the computer. His son did not turn the computer off and there was a dispute as to whether his son yelled at him or what happened. But no matter which version you believe, what happened was that [defendant] grabbed his son by the neck, his daughter was next to him, all of them ended up on the floor as a result and it didn't end there.

The altercation continued, and according to [defendant's] testimony, they were on the floor and he held them down on the floor.

These children did have injuries. The children were seen at the hospital. The injuries were consistent with an assault.

. . . .

I'm satisfied the discrepancy between the police and the hospital is because the police did not examine these children.... [W]e heard from the officer ... that ... he didn't ... check the kids.... So there was no way for him to verify whether these injuries occurred.

According to what [defendant] told the worker, he did in fact grab his son by the arm and held the arm back....

. . . .

[E]ven taking both stories and putting them together in terms of what the stories were in terms of the parts of the stories that were alike, which was that in fact [defendant] grabbed the children. He held them down and they suffered injuries as a result of that.

Based upon these findings, the trial judge entered a fact-finding order stating that defendant had abused or neglected the children, and scheduling a compliance review for February 8, 2007. On that date the court entered an order dismissing M.C. IV from the litigation and placing him in the custody of N.A. At the final compliance review on November 28, 2007, the judge entered the order terminating litigation.

On appeal, defendant raises the following issues for our consideration:

POINT I

THERE DID NOT EXIST SUBSTANTIAL, CREDIBLE EVIDENCE SUPPORTING THE COURT'S FINDING OF NEGLECT AND ABUSE BY A PREPONDERANCE OF EVIDENCE AND THE TRIAL COURT DID NOT PROPERLY APPLY THE LAW TO ITS FINDING OF FACTS.

POINT II

THE TRIAL COURT ERRED BY ALLOWING THE ADMISSION OF OPINION EVIDENCE WITHOUT PROVIDING [DEFENDANT] THE OPPORTUNITY TO CROSS-EXAMINE THE AUTHOR OF THE OPINION, IN VIOLATION OF HIS 14th AMENDMENT RIGHT TO DUE PROCESS OF LAW. (Not Raised Below)

Following oral argument, we asked all counsel to submit supplemental briefs on the following two issues: (1) whether the medical records introduced into evidence were admissible pursuant to *N.J.S.A.* 9:6–8.46, *Rule* 5:12–4(d) and *In re Guardianship of Cope,* 106 *N.J.Super.* 336, 255 *A.2d* 798 (App.Div.1969); and (2) whether the United States Supreme Court's decision in *Crawford v. Washington,* 541 *U.S.* 36, 124 *S.Ct.* 1354, 158 *L.Ed.*2d 177 (2004), should apply to DYFS abuse and neglect proceedings.

## II.

Almost thirty years ago, in *In re Guardianship of Cope,* we addressed the quality of proofs necessary in proceedings involving the "substantial rights" of parents facing the loss of custody of their children. 106 *N.J.Super., supra,* at 343, 255 *A.2d* 798. That case involved a guardianship proceeding, rather than an abuse and neglect proceeding as presented in this matter. However, both types of proceedings impact substantially upon fundamental pa-

rental rights, and we have emphasized that the "fact-finding hearing is a critical element of the abuse and neglect process.... The judge's determination has a profound impact on the lives of families embroiled in this type of a crisis." *Div. of Youth & Family Servs. v. J.Y.,* 352 *N.J.Super.* 245, 264, 800 *A.*2d 132 (App.Div.2002).

In *In re Guardianship of Cope,* "several of [DYFS]'s witnesses testified from written reports prepared by other [DYFS] personnel.... The testimony of the witnesses was 'double' (sometimes 'triple') hearsay, making verification of its accuracy virtually impossible." 106 *N.J.Super., supra* at 344, 255 *A.*2d 798. The concerns we raised then remain pertinent today and are relevant to this case:

> In view of the fact that almost all of the evidence presented in support of the [decision] was hearsay, we are presented with the difficult question of what type of evidence is to be considered competent in a proceeding of this type. Although we are not dealing here with a criminal proceeding against the parent, the allegations of the petitions concern her conduct and it is quite apparent that substantial rights of hers are involved. In a situation such as this it is of great importance that the evidence upon which judgment is based be as reliable as the circumstances permit and that the answering parent be given the fullest possible opportunity to test the reliability of [DYFS]'s essential evidence by cross-examination.
>
> On the other hand, we are dealing here with a statutory scheme established to provide a means by which [DYFS] ... may obtain guardianship of children in [DYFS]'s custody.... [A] rule requiring all [DYFS] personnel having contact with a particular case to give live testimony on all matters within their personal knowledge would cause an intolerable disruption in the operation of [DYFS].
>
> As a result, it becomes necessary to allow certain evidence to be produced in a hearsay form while seeking to give full protection to the rights of the parent. In reaching this balance, we conclude that in cases of this type [DYFS] should be permitted to submit into evidence, pursuant to *Evidence Rules* 63(13) [*N.J.R.E.* 803(c)(6)] and 62(5) [*N.J.R.E.* 801(d)], reports by [DYFS] staff personnel (or affiliated medical, psychiatric, or psychological consultants), prepared from their own first-hand knowledge of the case, at a time reasonably contemporaneous with the facts they relate, and in the usual course of their duties with [DYFS].
>
> Reports of this type, prepared by the qualified personnel of a state agency charged with the responsibility for overseeing the welfare of children in the State, supply a reasonably high degree of reliability as to the accuracy of the facts contained therein.
>
> ....

> As to oral or written reports from ... other persons, the usual rules governing admissibility of hearsay evidence should apply.
>
> [*Id.* at 343–44, 255 *A.*2d 798.]

"Hearsay" is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." *N.J.R.E.* 801(c). "Hearsay is inadmissible unless it falls within one or more of the exceptions enumerated in our evidence rules." *State et rel. J.A.,* 195 *N.J.* 324, 336, 949 *A.*2d 790 (2008) (citing *State v. Branch,* 182 *N.J.* 338, 357, 865 *A.*2d 673 (2005)).

*N.J.R.E.* 801(d) defines "business" as used in the rules governing hearsay, as "includ[ing] every kind of business, institution, association, profession, occupation and calling, whether or not conducted for profit, and also includ[ing] activities of governmental agencies." *N.J.R.E.* 803(c)(6) defines "records of regularly conducted activity" as:

> [a] statement contained in a writing or other record of acts, events, conditions, and, subject to Rule 808,[2] opinions or diagnoses, made at or near the time of observation by a person with actual knowledge or from information supplied by such a person, if the writing or other record was made in the regular course of business and it was the regular practice of that business to make it, unless the sources of information or the method, purpose or circumstances of preparation indicate that it is not trustworthy.

*Rule* 5:12–4(d) provides that DYFS "shall be permitted to submit into evidence, pursuant to *N.J.R.E.* 803(c)(6) and 801(d), reports by staff personnel or professional consultants. Conclusions drawn from the facts stated therein shall be treated as prima facie evidence, subject to rebuttal."

DYFS contends that the Screening Summary form and medical examination sheets were properly introduced into evidence here,

---

2 *N.J.R.E.* 808 provides: "Expert opinion which is included in an admissible hearsay statement shall be excluded if the declarant has not been produced as a witness unless the trial judge finds that the circumstances involved in rendering the opinion, including the motive, duty, and interest of the declarant, whether litigation was contemplated by the declarant, the complexity of the subject matter, and the likelihood of accuracy of the opinion, tend to establish its trustworthiness."

not only under *Rule* 5:12–4(d), but also pursuant to *N.J.S.A.* 9:6–8.46(a)(3), which provides:

> In any hearing under this act, . . . any writing, record or photograph, whether in the form of entry in a book or otherwise, made as a memorandum or record of any condition, act, transaction, occurrence or event relating to a child in an abuse or neglect proceeding of any hospital or any other public or private institution or agency shall be admissible in evidence in proof of that condition, act, transaction, occurrence or event, *if the judge finds that it was made in the regular course of the business of any hospital or any other public or private institution or agency,* and that it was in the regular course of such business to make it, at the time of the condition, act, transaction, occurrence or event, or within a reasonable time thereafter, shall be prima facie evidence of the facts contained in such certification.
>
> [Emphasis added.]

At the outset, it is important to clarify that the medical records at issue here are *not* hospital business records "made in the regular course of [Cooper Hospital's] business. . . ." *N.J.R.E.* 803(c)(6). Rather, these records are all DYFS-generated documents created in the wake of Dr. Lewis' referral to the agency. It is undisputed that these documents contain hearsay references to the doctor's opinions, as well as "double hearsay" references to the children's statements allegedly made to hospital staff. Dr. Lewis, as noted, filled out these medical examination forms provided by DYFS; none of Dr. Lewis' hospital records were introduced into evidence; nor did the doctor testify at the hearing.

The Screening Summary form prepared by DYFS workers Jimenez and Dickerson was not prepared from those individuals' "actual knowledge" as contemplated by *N.J.R.E.* 803(c)(6). Rather, Dr. Lewis was the source of the information Jimenez and Dickerson wrote in their report.

A critical flaw in DYFS's argument is that neither Dr. Lewis nor any other staff at Cooper Hospital who may have been involved in treating the children come within the category of "affiliated medical . . . consultants" as contemplated in *In re Guardianship of Cope, supra,* 106 *N.J.Super.* at 343, 255 *A.*2d 798. When, as here, DYFS first became involved when contacted by Dr. Lewis, the resulting DYFS reports are a step removed from

the type of report contemplated by *Rule* 5:12–4(d), as well as by *In re Guardianship of Cope.*

■ Where DYFS makes the initial referral to a DYFS-retained professional, resulting in an examination report proffered in evidence at a subsequent abuse or neglect proceeding, that professional is considered an "affiliated ... consultant[.]" Thus, such a referral by DYFS may satisfy the concern that there be a "reasonably high degree of reliability as to the facts contained therein." *In re Guardianship of Cope, supra,* 106 *N.J.Super.* at 344, 255 *A.2d* 798. The reliability of such evidence remains an issue to be assessed on a case by case basis within the trial judge's discretion. Where, however, DYFS's initial involvement in a matter arises from a referral by a non-affiliated professional such as Dr. Lewis, the facts and opinions contained in that individual's statements to a DYFS screening worker or on a DYFS-provided medical examination form do not rise to the "reasonably high degree of reliability[,]" *ibid.,* required of DYFS's proofs in this type of proceeding.

■ Under these circumstances, we conclude that neither the Screening Summary report nor the DYFS-generated medical examination forms completed by Dr. Lewis come within *N.J.S.A.* 9:6–8.46(a)(3). None of those documents "was made in the regular course of the business of [Cooper Hospital.]" Nor were these records made in the "regular course of ... the business of [DYFS]," as they were not prepared by "affiliated consultants." DYFS's endorsement of the statements and opinions of Dr. Lewis, a non-"affiliated ... consultant," fails to satisfy both the statutory and rule requirements.

In addition, the Screening Summary form was not "prepared from [the DYFS workers'] own first-hand knowledge of the case...." *In re Guardianship of Cope,* 106 *N.J.Super., supra,* at 343, 255 *A.2d* 798. Only when such reports contain a worker's "'first-hand knowledge of the case'" [should they be] treated by the courts as "'supply[ing] a reasonably high degree of reliability as to the accuracy of the facts contained therein.'" *Div. of Youth & Family Servs. v. A.W.,* 103 *N.J.* 591, 595 n. 1, 512 *A.2d* 438

(1986) (quoting *In re Guardianship of Cope, supra,* 106 *N.J.Super.* at 343, 344, 255 *A.*2d 798). Again, we leave it to the trial judge to determine the reliability of this type of evidence as well, on a case by case basis. We conclude that the Screening Summary in evidence here contained impermissible hearsay both as to the medical conclusion that the children presented symptoms "consistent with an assault[,]" as well as the substance of the children's allegations related to Dr. Lewis.

We are, of course, aware that this issue is presented as "plain error" as no objection was raised below. *R.* 2:10–2. Under the circumstances, however, we conclude that the admission of these DYFS-generated documents was "clearly capable of producing an unjust result," because the trial judge relied directly upon that evidence in finding that the children had been abused and neglected. Where, as here, a DYFS worker was permitted to testify "regarding medical conclusions attributed to [a doctor] . . . who was not a [DYFS] consultant [and] did not testify at the fact-finding hearing[,] . . . the testimony by [the worker] regarding the [examination] results [was] unreliable and inadmissible." *Div. of Youth & Family Servs. v. I.Y.A.,* 400 *N.J.Super.* 77, 91, 946 *A.*2d 62 (App.Div.2008).

The trial judge essentially made no findings as to credibility. Her finding that *"no matter which version you believe,* what happened was that [defendant] grabbed his son by the neck," ignores defendant's testimony that he grabbed M.C. IV by his shirt as his son was going upstairs, and appears to be based exclusively upon M.C. IV's statement to Still. The judge relied upon the DYFS-generated documents to conclude that the children exhibited markings "consistent with an assault" and that such an assault had been committed by defendant. That reliance would explain the judge's acceptance of M.C. IV's statement that defendant grabbed him "by the neck," over defendant's testimony that he grabbed his son's shirt.

Considering the trial judge's cursory review of the testimonial evidence, her reliance upon the DYFS-generated documentary

evidence takes on even greater significance. We have concluded that these documents do not satisfy the prerequisites for "a reasonably high degree of reliability as to the accuracy of the facts contained therein[,]" *In re Guardianship of Cope, supra,* 106 *N.J.Super.* at 344, 255 *A.2d* 798, and do not meet the requirements set forth in *N.J.S.A.* 9:6–8.46(a)(3). Therefore, those documents and the trial judge's reliance upon them were "clearly capable of producing an unjust result[.]" *R.* 2:10–2.

On remand, DYFS shall be required to present proofs consistent with the standards set by *In re Guardianship of Cope, supra,* 106 *N.J.Super.* at 343–44, 255 *A.2d* 798, and the controlling statute and rules. DYFS workers should only be permitted to testify to facts within "their own first-hand knowledge of the case," *id.* at 343, 255 *A.2d* 798, and any supporting medical testimony shall either come from "affiliated ... consultants" of DYFS or be presented in compliance with our hearsay rules, *N.J.R.E.* 801 to 808 and the requirements of *N.J.S.A.* 9:6–8.46(a)(3).[3]

### III.

Because we reverse this matter for the reasons stated, we need not reach the issue of whether *Crawford v. Washington, supra,* applies in DYFS abuse and neglect proceedings. *Crawford's* hearsay protections derive from the Confrontation Clause of the Sixth Amendment to the United States Constitution, which pertains to "criminal prosecutions," not to civil trials. 541 *U.S.* at 61, 124 *S.Ct.* at 1370, 158 *L.Ed.2d* at 199.

---

[3] Since we have resolved this issue on the grounds stated, we need not reach defendant's claim that admission of the challenged evidence violated his Fourteenth Amendment right to due process. "[W]e do not address constitutional questions when a narrower, non-constitutional result is available." *United States v. Scurry,* 193 *N.J.* 492, 500 n. 4, 940 *A.2d* 1164 (2008) (citing *Randolph Town Center, L.P. v. County of Morris,* 186 *N.J.* 78, 80, 891 *A.2d* 1202 (2006) ("[c]ourts should not reach a constitutional question unless its resolution is imperative to the disposition of litigation")).

The order of December 15, 2006, as well as the resultant orders of February 8, 2007 and November 28, 2007 are reversed and remanded for proceedings in conformance with this opinion.