990 A.2d 1097

NEW JERSEY DIVISION OF YOUTH AND FAMILY
SERVICES, PLAINTIFF–APPELLANT, v. M.C.
III, DEFENDANT–RESPONDENT.

IN THE MATTER OF M.C. IV AND N.C., MINORS.

Argued October 13, 2009—Decided March 31, 2010.

*James D. Harris,* Deputy Attorney General, argued the cause for appellant (*Anne Milgram,* Attorney General of New Jersey, attorney; *Melissa H. Raksa,* Assistant Attorney General, of counsel).

*James A. Louis,* Deputy Public Defender, argued the cause for appellants M.C. IV and N.C. (*Yvonne Smith Segars,* Public Defender, Law Guardian, attorney; *Olivia Belfatto Crisp,* Assistant Deputy Public Defender, on the letter briefs).

*Beatrix W. Shear,* Deputy Public Defender, argued the cause for respondent (*Yvonne Smith Segars,* Public Defender, Parental Representation, attorney; *Ms. Shear* and *Michael C. Wroblewski,* Designated Counsel, on the briefs).

*Mary M. McManus–Smith* submitted a brief on behalf of *amicus curiae* Legal Services of New Jersey (*Melville D. Miller, Jr.,* President, attorney; *Ms. McManus–Smith, Mr. Miller,* and *Jeyanthi C. Rajaraman,* on the brief).

Justice WALLACE, JR., delivered the opinion of the Court.

This is an abuse and neglect case. On September 24, 2006, a brother and sister were examined at a hospital emergency room.

Based on the injuries observed, the examining physician contacted the Division of Youth and Family Services (the Division), and a Division caseworker investigated the allegations of the children that their father caused their injuries. At some point during the initial investigation, the examining physician received a form from the Division on which the physician detailed the injuries of each child and opined that the injuries were consistent with an assault. Thereafter, a document entitled Screening Summary was completed summarizing the pertinent factual allegations, the people involved, and other relevant information.

The children were removed from the custody of their father, and an abuse and neglect complaint was filed against him. The Division offered numerous exhibits into evidence at the fact-finding hearing, and, except for one exhibit that was not admitted, defense counsel did not object to their admission. Consequently, there was no need for the Division to attempt to justify the admission of the documents or for the trial court to rule on their admissibility.

The trial court found by a preponderance of the evidence that the father caused the injuries to his children, and ordered that care and custody of the children remain with the Division to explore the possible placement of the children with their stepsister. A subsequent order granted custody to the stepsister.

The father appealed. In a published opinion, the Appellate Division reversed, concluding that the documents were improperly admitted into evidence. We granted the Division's and the Law Guardian's petitions for certification. We now reverse. We hold that consistent with the doctrine of invited error, on appeal, the father may not protest the admission of the documents after he agreed to their admission at trial. We also conclude that there was sufficient credible evidence to support the trial court's decision.

I.

The following evidence was presented at the fact-finding hear-

ing held on December 15, 2006. Michael and Tracey Collins [1] were divorced in 1999, and Michael was awarded custody of their two children, Matt and Nicole. Matt was born in April 1991, and Nicole was born in July 1993. The children were fifteen and thirteen respectively at the time of the incident in early fall of 2006.

At that time, Michael became increasingly concerned with Matt and Nicole's internet usage and their conflicts regarding the use of the computer. To help alleviate the conflict, Michael purchased a second computer with a feature that allowed him to monitor and control his children's use of the computer. Michael designated himself the "administrator," which permitted him to configure the computer with parental control settings. Under that configuration, any other user on the computer would need to log on as a "guest," and then Michael needed to insert a password for the children to use the system.

On September 24, 2006, Matt and Nicole discovered they no longer had unrestricted access to the computer. They expressed their dislike of the new computer arrangement. They began commenting that they were guests in their home, and as guests, they did not have to do any chores or help around the house. In turn, Michael disciplined the children. He required each child to write five hundred times the phrase, "I will not say I'm a guest in my own house." Matt decided to use the computer to complete his punishment. When Michael discovered that Matt was in the process of typing the phrase once and copying it five hundred times on the computer, he ordered Matt to write the assignment by hand.

Matt logged off of the computer and started hollering, "[t]his is bull crap." When Matt started up the steps, Michael instructed him to come back downstairs. Michael claimed that he followed Matt up the stairs, and pulled Matt's shirt in an attempt to stop

[1] The names of the parents and children have been changed to protect their privacy.

him. In contrast, Matt told the Division investigator that as he began walking up the stairs, his father followed him and began hitting him for no reason.

Michael testified that Nicole started yelling, "get your f....ng hands off my brother!" Michael turned around and told Nicole, "[o]h, you want some," and started to move towards Nicole. She ran to her father's bedroom, and Michael followed her. Matt jumped on Michael's back and wrapped his arms around Michael's neck. Michael lost his balance and all three fell onto the floor of his bedroom. Michael said he held Matt and Nicole down on the floor to help calm them down.

Contrary to Michael's testimony, both Matt and Nicole recounted that Michael caught up to Nicole and began choking her. Matt added that Michael hit Nicole in her stomach and back and that, after they fell to the floor, Michael began punching him. Nicole then ran out of Michael's bedroom and called 9-1-1. Nicole's statement to the Division caseworker was consistent with Matt's statement on those points, but she added that she and her brother locked themselves in the bathroom until the police arrived.

Officer LaFountaine and his partner responded to the 9-1-1 call at approximately 12:30 p.m. Officer LaFountaine spoke with Matt and Nicole, while his partner spoke with Michael. He said that the children claimed their father had been beating them, but he did not observe any injuries. When he asked them where their father hit them, they responded "all over." Officer LaFountaine did not ask them to remove any clothing to look for injuries. He said that he and his partner left after approximately twenty to thirty minutes.

Michael testified that after the police left, he instructed Matt and Nicole to go upstairs, but both refused. Nicole insisted on calling her older sister Nancy because she wanted to stay with her. Matt attempted to leave the house, but Michael said "no," and pushed him back from the door several times. When Michael walked over to Nicole, Matt went outside and called 9-1-1. Mi-

chael said that when the police returned, he was in his truck preparing to leave for work.

Officer LaFountaine testified that he and his partner received a second call to return to the residence shortly after they left the home. They spoke to Matt and noticed that Michael was in his truck preparing to leave for work. The police also left.

The children went to a relative's house. They eventually called their mother, who decided to take the children to the emergency room at Cooper University Hospital in Camden. Dr. Amy Lewis examined the children. She noticed that Nicole had abrasions behind her ear and tenderness of the ribs and that Matt had scratches on his neck, abrasions and swelling over his ribs, and a soft tissue injury to his right hand. At 5:52 p.m., Dr. Lewis contacted the Special Response Unit at the Division to report the alleged abuse.

Division caseworker Rachel Still immediately began her investigation. She visited the hospital and spoke with Matt and Nicole, who recounted the altercation with their father. Still observed various injuries on the children and spoke with Dr. Lewis and Dr. McCanns about the results of the examinations. Dr. McCanns informed Still that color photographs of the injuries would be available at N.J. Cares, an organization affiliated with the Division. Later, after Still reviewed the photographs, she said the pictures fairly represented the injuries she saw on the children.

Still said she was present when her co-worker interviewed Michael about the incident. She heard Michael say that at one point he grabbed Matt from behind and Nicole screamed for him to get off of her brother. Michael replied, "[d]o you want some," after which he grabbed both of them and threw them to the floor. Michael added that Matt was trying to hit him, so he grabbed Matt's hand and placed it behind Matt to calm Matt down.

The following day, September 25, 2006, another Division caseworker, Danielle Garwood, transported Matt and Nicole to Virtua

Hospital for physicals to determine their placement. Garwood said she observed injuries on the children.

On September 27, 2006, the children were also examined at Haddonfield Pediatrics. The forms completed by the physicians at Haddonfield Pediatrics indicated that the cause of their injuries was the alleged assault.

As part of its case, the Division sought to admit fifteen exhibits into evidence. Except for exhibit P–1, which was the Division's Initial Response Data form for an asserted problem that occurred in 1998, all exhibits were admitted without objection.

At the conclusion of the hearing, the trial court stated the following:

I find the children to be abused and neglected children. I make this finding by a preponderance of the believable evidence.

On the date in question, which was September 24th, the children had been on the computer. [Defendant] told them to get off the computer. His son did not turn the computer off and there was a dispute as to whether his son yelled at him or what happened. But no matter which version you believe, what happened was that [defendant] grabbed his son by the neck, his daughter was next to him, all of them ended up on the floor as a result and it didn't end there.

The altercation continued, and according to his testimony, they were on the floor and he held them down on the floor.

These children did have injuries. The children were seen at the hospital. The injuries were consistent with an assault.

I note that I asked [defendant] what his height and weight was, and [defendant] is a well built man. He is five-ten and 200 pounds [.] His daughter weigh[ed] ... 149 pounds when she was at the hospital. She is about five-two. Wait a minute. And Matt is smaller than that. He's about five-four and I guess ... he weighs about 110 pounds.

The children are considerably smaller than he is. Now he might have had good intentions and I don't dispute the fact that he had a problem with his daughter, that they were probably on the computer for purposes other than the purposes that he intended the computer to be used for, that he denied them access and he may very well have been at his wits end, and on that particular day, he probably got upset.

The children called the police. The police came out. I'm satisfied the discrepancy between the police and the hospital is because the police did not examine these children. Had the police examined these children, and we heard from the officer, say that he didn't. He didn't check the kids. He didn't check the daughter's ear. He didn't check the son's neck or his back. So there was no way for him to verify whether these injuries occurred.

According to what he told the worker, he did in fact grab his son by the arm and held the arm back, and that is in the dictation when he was interviewed.

\* \* \*

He said that he had grabbed [Matt]'s right hand and held it behind the back to stop him from hitting him. And that's where [Matt] had the bruise and the swelling of his hand. So the children—he had right hand swelling and there was a problem with his thumb according to P-3. And he had linear abrasions around the chest, the neck, and the back. Those injuries are consistent with—even taking both stories and putting them together in terms of what the stories were in terms of the parts of the stories that were alike, which was that in fact [defendant] grabbed the children. He held them down and they suffered injuries as a result of that.

On December 15, 2006, the trial court memorialized its findings and placed the children in the care and custody of the Division. The court also ordered the Division to investigate placing the children with their adult stepsister as a kinship legal guardian.

Michael appealed. He claimed error in the admission of the documentary evidence, and that there was insufficient evidence presented at the fact-finding hearing to warrant a finding of abuse. After oral argument, the panel issued an order requesting supplemental briefing on the following two issues:

(1) whether the medical records introduced into evidence were admissible pursuant to *N.J.S.A.* 9:6–8.46(a)(3), *Rule* 5:12–4(d) and *In the Matter of the Guardianship of Cope*, 106 *N.J.Super.* 336, 255 *A.2d* 798 (App.Div.1969); and (2) whether the United States Supreme Court's decision in *Crawford v. Washington*, 541 *U.S.* 36, 124 *S.Ct.* 1354, 158 *L.Ed.2d* 177 (2004), should apply to DYFS abuse and neglect proceedings. [*N.J. Div. of Youth & Family Servs. v. M.C. III*, 405 *N.J.Super.* 24, 32, 963 *A.2d* 348 (App.Div.2008).]

Following the receipt of the supplemental briefs, the panel concluded that it was error to admit into evidence the Screening Summary and the DYFS-generated forms completed by Dr. Lewis because she was not an "affiliated medical consultant," nor was she a "professional consultant" under *Rule* 5:12–4(d). *M.C. III, supra,* 405 *N.J.Super.* at 35–36, 963 *A.2d* 348. Consequently, the panel concluded that the forms completed by Dr. Lewis could not fall within the ambit of *Rule* 5:12–4(d) or *N.J.S.A.* 9:6–8.46(a)(3). *Id.* at 36, 963 *A.2d* 348. Further, the panel found that the information contained in the Screening Summary did not come from first-hand knowledge of the caseworkers who prepared the

report, but rather came from information the caseworker received from Dr. Lewis. *Id.* at 36–37, 963 *A.*2d 348. The panel concluded that those errors were sufficiently prejudicial to constitute plain error because of the trial court's extensive reliance on the version of the events as detailed in the documents produced by the Division. *Id.* at 37–38, 963 *A.*2d 348. The panel reversed and remanded the matter for a new trial. *Id.* at 39, 963 *A.*2d 348.

We granted the Division's and the Law Guardian's petitions for certification. 199 *N.J.* 515, 973 *A.*2d 383 (2009).

## II.

The Division contends that the Appellate Division erred in holding that the forms completed by Dr. Lewis were not admissible under *Rule* 5:12–4(d) or *N.J.S.A.* 9:6–8.46(a)(3). In particular, it asserts that the panel's interpretation of that *Rule* and statute is contrary to the plain meaning of those texts and is inconsistent with the intended scope of the business-records exception to the hearsay rule. Additionally, the Division argues that the Appellate Division incorrectly determined that the alleged errors constituted plain error because the evidence was admitted with consent of all counsel and was cumulative of other testimony and evidence that was properly admitted.

The Law Guardian maintains that the Appellate Division incorrectly held that the exhibit containing the Screening Summary was inadmissible because the caseworker who created the document did not have first-hand knowledge of the case. The Law Guardian contends that Rachel Still was the author of the handwritten notes in the Screening Summary and that she testified about her involvement in the investigation at the fact-finding hearing. Finally, the Law Guardian argues that the Appellate Division improperly excluded the Screening Summary and forms completed by Dr. Lewis as both documents satisfied *N.J.R.E.* 803(c)(6).

In contrast, Michael contends that the Appellate Division correctly concluded that Dr. Lewis was not a Division consultant and

that the Division generated forms she completed should not have been admitted into evidence. Furthermore, he argues that the Screening Summary should not have been admitted into evidence, and that the remand was proper because the Division was required to produce Dr. Lewis for live testimony pursuant to case law and the Confrontation Clause of the New Jersey and United States Constitutions.

## III.

■ The Appellate Division found plain error in the admission of documentary evidence and the use of hearsay contained within the documents. *Id.* at 37, 963 *A.*2d 348. The panel reasoned that the admission of those documents was clearly capable of producing an unjust result. *Ibid.*

We find no need to address those assertions of error. We have often stated that issues not raised below will ordinarily not be considered on appeal unless they are jurisdictional in nature or substantially implicate the public interest. *See County of Essex v. First Union Nat'l Bank,* 186 *N.J.* 46, 51, 891 *A.*2d 600 (2006).

In the present case, it is not disputed that defendant's trial counsel did not object to the admission of the documents that he now claims was error for the court to admit. Specifically, the discussion concerning the admission of the Division's exhibits P-2 through P-15, which include the medical reports and Screening Summary, was as follows:

Division Counsel: Your Honor, I believe that counsel is not objecting to the bulk of the exhibits in this packet, other than [P-1]. There's some other documents I would enter through Ms. [Still] because they were also part of her investigation. But—

The Court: Can I have a list of exhibits so that I know what we're talking about please?

Division Counsel: Yes.

The Court: Do you have an extra one for my staff or no? Thank you. That way I know. I can mark as we go along. Okay.

So let me see if I understand what you're saying. P-2 through P-15, other than the ones that are already in, you would like to move in without objection. Is that what you are saying?

Division Counsel: Yes, I believe that [defense counsel] can correct me if I'm wrong, that the only exhibit that he's objecting to is P–1.

The Court: P–1, okay. [Defense counsel], any objection?

Law Guardian Counsel: No objection.

Defense Counsel: That's correct, Judge.

\* \* \*

The Court: Okay. Then P–2 through P–15 are now all in evidence[.]

Despite this clear expression by defense counsel that he had no objection to the admission of the various documents labeled P–2 through P–15, the panel found that the admission of the Screening Summary and the Division generated documents were clearly capable of producing an unjust result because the trial court relied upon that evidence in finding that the children were abused and neglected. *M.C. III, supra,* 405 *N.J.Super.* at 37, 963 *A.*2d 348. Although the Division argued before the panel that defendant consented to the admission of the documents and should not be permitted to take a different position on appeal, the panel did not consider the doctrine of invited error. *Id.* at 34, 963 *A.*2d 348.

"The doctrine of invited error operates to bar a disappointed litigant from arguing on appeal that an adverse decision below was the product of error, when that party urged the lower court to adopt the proposition now alleged to be error." *Brett v. Great Am. Recreation,* 144 *N.J.* 479, 503, 677 *A.*2d 705 (1996). As we stated in *State v. Jenkins,* "a defendant cannot beseech and request the trial court to take a certain course of action, and upon adoption by the court, take his chance on the outcome of the trial, and if unfavorable, then condemn the very procedure he sought . . . claiming it to be error and prejudicial." 178 *N.J.* 347, 358, 840 *A.*2d 242 (2004) (citations and internal quotation marks omitted). The doctrine of invited error "is based on considerations of fairness and preservation of the integrity of the litigation process." *Brett, supra,* 144 *N.J.* at 503, 677 *A.*2d 705.

Our courts have applied the doctrine of invited error in a wide variety of situations. *State v. Kemp,* 195 *N.J.* 136, 155, 948 *A.*2d

636 (2008) (applying invited error doctrine because defense counsel agreed to officer's testimony); *Brett, supra,* 144 *N.J.* at 503, 677 *A.*2d 705 (stating that defendant barred by doctrine of invited error from contesting application of Ski Statute); *State v. Corsaro,* 107 *N.J.* 339, 345, 526 *A.*2d 1046 (1987) ("Trial errors which were induced, encouraged or acquiesced in or consented to by defense counsel ordinarily are not a basis for reversal on appeal[.]") (internal citations and quotation marks omitted); *Titus v. Lindberg,* 49 *N.J.* 66, 78, 228 *A.*2d 65 (1967) (noting that Board of Education was barred from asserting error in jury charge it requested); *State v. Baluch,* 341 *N.J.Super.* 141, 194–95, 775 *A.*2d 127 (App.Div.), *certif. denied,* 170 *N.J.* 89, 784 *A.*2d 721 (2001) (noting that defendant was barred by doctrine of invited error from claiming error in failing to excuse juror when defendant argued at trial to keep juror); *Spedick v. Murphy,* 266 *N.J.Super.* 573, 593, 630 *A.*2d 355 (App.Div.), *certif. denied,* 134 *N.J.* 567, 636 *A.*2d 524 (1993) ("A party who consents to, acquiesces in, or encourages an error cannot use that error as the basis for an objection on appeal."); *Venuto v. Lubik Oldsmobile, Inc.,* 70 *N.J.Super.* 221, 229, 175 *A.*2d 477 (App.Div.1961) (holding that party may not raise as plain error admission of evidence where party agreed to its admission at trial).

The record is clear that defendant consented to the admission of the relevant documents. Indeed, the one document that defendant objected to, P–1, was not admitted into evidence. Importantly, by consenting to the admission of the documents, defendant deprived the Division of the opportunity to overcome any objection and deprived the trial court of the necessity to make a ruling based on the arguments presented by both sides. That is, if defense counsel had objected to the Screening Summary and other documents, and the trial court agreed with those objections, the Division could have taken steps to satisfy any evidentiary requirements needed for the admission of the documents or presented a witness or witnesses in place of the documents.

In short, we find no error in the trial court's reliance on defense counsel's indication that he did not object to the admission of the various documents. Particularly where defense counsel may have made a strategic decision to try the case based on the documents, instead of possibly facing a witness's direct testimony, it would be unfair to the Division to reverse on this issue. It is not disputed that defense counsel had sufficient time to review the exhibits and raise objections to the exhibits. Except for P–1, defense counsel made no such objection. Under those circumstances, we hold that defendant is barred by the doctrine of invited error from contesting for the first time on appeal the admission of the various documents. Thus, we find no reversible error in the trial court's consideration of those documents in reaching its conclusions.

■ In spite of our invocation of the doctrine of invited error, we would not automatically apply the doctrine if it were to "cause a fundamental miscarriage of justice." *Brett, supra*, 144 *N.J.* at 508, 677 *A.2d* 705 (citing *State v. Ramseur*, 106 *N.J.* 123, 281–82, 524 *A.2d* 188 (1987), and *Ferry v. George Settle Fischer Baking Co.*, 6 *N.J.* 262, 78 *A.2d* 264 (1951)). However, we are convinced that this case presents no fundamental injustice that would warrant relaxing the invited error doctrine.

## IV.

■ We turn now to address whether there was sufficient credible evidence to support the trial court's findings.

■ In a non-jury civil action, the trial court shall make findings of fact and state its conclusions of law. *R.* 1:7–4(a). That is, "the trial court must state clearly its factual findings and correlate them with the relevant legal conclusions." *Curtis v. Finneran*, 83 *N.J.* 563, 570, 417 *A.2d* 15 (1980). Moreover, appellate courts "defer to the factual findings of the trial court because it has the opportunity to make first-hand credibility judgments about the witnesses who appear on the stand; it has a feel of the case that can never be realized by a review of the cold

record." *N.J. Div. of Youth & Family Servs. v. E.P.*, 196 *N.J.* 88, 104, 952 *A.*2d 436 (2008) (citation and internal quotations marks omitted). Indeed, we recognize that "[b]ecause of the family courts' special jurisdiction and expertise in family matters, appellate courts should accord deference to family court factfinding." *Cesare v. Cesare*, 154 *N.J.* 394, 413, 713 *A.*2d 390 (1998).

Title 9 controls the adjudication of abuse and neglect cases. *N.J.S.A.* 9:6–8.21 to –8.73. The safety of children is the paramount concern. *N.J.S.A.* 9:6–8.8. An abused or neglected child is defined in pertinent part as

> a child less than 18 years of age whose parent or guardian, as herein defined, (1) inflicts or allows to be inflicted upon such child physical injury by other than accidental means which causes or creates a substantial risk of death, or serious or protracted disfigurement, or protracted impairment of physical or emotional health or protracted loss or impairment of the function of any bodily organ; (2) creates or allows to be created a substantial or ongoing risk of physical injury to such child by other than accidental means which would be likely to cause death or serious or protracted disfigurement, or protracted loss or impairment of the function of any bodily organ; ... (4) or a child whose physical, mental, or emotional condition has been impaired or is in imminent danger of becoming impaired as the result of the failure of his parent or guardian, as herein defined, to exercise a minimum degree of care (a) in supplying the child with adequate food, clothing, shelter, education, medical or surgical care though financially able to do so or though offered financial or other reasonable means to do so, or (b) in providing the child with proper supervision or guardianship, by unreasonably inflicting or allowing to be inflicted harm, or substantial risk thereof, including the infliction of excessive corporal punishment; or by any other acts of a similarly serious nature requiring the aid of the court.
>
> [*N.J.S.A.* 9:6–8.21(c)(1)–(2), (4).]

"Parent or guardian" is defined as "any natural parent, adoptive parent, ... or any person, who has assumed responsibility for the care, custody or control of a child[.]" *N.J.S.A.* 9:6–8.21(a).

The Division is charged with the responsibility for the "care, custody, guardianship, ... and protection of children[.]" *N.J.S.A.* 30:4C–2(a). In an abuse and neglect case, the Division must establish by a preponderance of the evidence that the child is abused or neglected and "only competent, material and relevant evidence may be admitted." *N.J.S.A.* 9:6–8.46(b). Similarly, the

pertinent regulation provides that abuse or neglect is "substantiated" when

> the available information, as evaluated by the child protective investigator, indicates by a preponderance of the evidence that a child is an abused or neglected child as defined [by the statute] because the alleged child victim has been harmed or placed at risk of harm by a parent or guardian.

[*N.J.A.C.* 10:129–1.3.]

We explained in *G.S. v. Department of Human Services*, that "[t]he legislative history of Title 9, precedent and public policy support the conclusion that a Title 9 inquiry must focus on the circumstances leading up to the injury and on the harm to the child, and not on the [parent or] guardian's intent." 157 *N.J.* 161, 176, 723 *A.*2d 612 (1999). We emphasized that "whether the [parent or] guardian intended to harm the child is irrelevant[,]" *ibid.*, and that when "a parent or guardian commits an intentional act that has unintended consequences, that action is considered 'other than accidental' within the meaning of Title 9." *Ibid.* Because the primary focus is the protection of children, "the culpability of parental conduct" is not relevant. *Id.* at 177, 723 *A.*2d 612.

In the present case, the panel criticized the trial court's lack of credible findings. *M.C. III, supra,* 405 *N.J.Super.* at 37–38, 963 *A.*2d 348. Further, the panel found that the court's reliance on the documents "to conclude that the children exhibited markings 'consistent with an assault' and that such an assault had been committed by defendant[,]" demonstrated that the trial court accepted Matt's "statement that defendant grabbed him 'by the neck,' over defendant's testimony that he grabbed his son's shirt." *Id.* at 37, 963 *A.*2d 348. The panel concluded that because the trial court's findings of abuse relied upon Division generated documentary evidence that should not have been admitted, the trial court's reliance upon them was clearly capable of producing an unjust result. *Ibid.*

In view of defendant's testimony that he grabbed his son by his shirt, as contrasted with the son's statement that his father grabbed him by the neck and punched him, we agree that the trial

court could and should have made more explicit credibility find-ings. Although the trial court did not expressly state that it disbelieved defendant's version, and believed the son's version, the court essentially accepted the son's version because it found that "what happened was that [defendant] grabbed his son by the neck." Thus, by that finding, the trial court essentially credited Matt's version and not defendant's.

Further, the court found that defendant told the Division case-worker that he grabbed "his son by the arm and held the arm back, . . . to stop [his son] from hitting him." The court noted that the son's injuries to his hand, thumb, chest, neck, and back "are consistent with—even taking both stories . . . in terms of the parts of the stories that were alike, which was that in fact [defendant] grabbed the children." The court concluded that the children suffered injuries as a result of defendant's conduct. Further, the court indicated that any discrepancy between the police and the hospital reports occurred because the police did not examine the children for injuries.

We conclude that there was sufficient evidence to support the trial court's finding of abuse. Even though defendant may not have intended to harm his children, his actions were deliberate. Defendant intentionally grabbed the children and disregarded the substantial probability that injury would result from his conduct. The trial court properly relied on testimonial and documentary evidence to conclude that defendant abused his children. Conse-quently, we reverse the judgment of the Appellate Division.

## V.

### A.

Our disposition of this case makes it unnecessary to decide whether various exhibits that were admitted would have been admissible in evidence if a proper objection had been made. Nevertheless, this appeal highlights the need to give some guid-ance for future cases. We take this opportunity to give some

general guidance for the admission of documentary evidence in abuse and neglect cases.

### B.

Our Legislature adopted comprehensive legislation for the protection and welfare of the children of this State. *N.J.S.A.* 9:6–8.21 to –8.73. Recently, we reviewed several sections of Title 9, noting that "[t]he evidence presented at the fact-finding hearing must be 'competent, material and relevant.'" *N.J. Div. of Youth & Family Servs. v. G.M.*, 198 *N.J.* 382, 398, 968 *A.2d* 698 (2009) (citation omitted). *N.J.S.A.* 9:6–8.46(a)(3) allows for the admission of documentary evidence and provides in pertinent part as follows:

> In any hearing under this act, . . . (3) any writing, record or photograph, whether in the form of an entry in a book or otherwise, made as a memorandum or record of any condition, act, transaction, occurrence or event relating to a child in an abuse or neglect proceeding of any hospital or any other public or private institution or agency shall be admissible in evidence in proof of that condition, act, transaction, occurrence or event, *if the judge finds that it was made in the regular course of the business of any hospital or any other public or private institution or agency, and that it was in the regular course of such business to make it, at the time of the condition, act, transaction, occurrence or event, or within a reasonable time* thereafter, shall be prima facie evidence of the facts contained in such certification. A certification by someone other than the head of the hospital or agency shall be accompanied by a photocopy of a delegation of authority signed by both the head of the hospital or agency and by such other employees. All other circumstances of the making of the memorandum, record or photograph, including lack of personal knowledge of the making, may be proved to affect its weight, but they shall not affect its admissibility[.]
>
> [*N.J.S.A.* 9:6–8.46(a)(3) (emphasis added).]

 Thus, the key to the admissibility of documents under that section is whether the evidence was created "in the regular course of business of any hospital or any other public or private institution or agency." *Ibid.* Although the phrase "in the regular course of business" is not defined in Title 9, our courts have suggested that the phrase should be interpreted as identical to the meaning of that phrase in the business-records exception to the hearsay rule. *N.J. Div. of Youth & Family Servs. v. E.D.*, 233 *N.J.Super.* 401, 413–14, 558 *A.2d* 1377 (App.Div.), *certif. denied*, 118 *N.J.* 232, 570 *A.2d* 983 (1989) (discussing *N.J.S.A.* 9:6–8.46,

*Rule* 5:12–4(d), and *Evidence Rule* 63(13), predecessor to *N.J.R.E.* 803(c)(6) interchangeably); *see also* Biunno, *Current N.J. Rules of Evidence,* comment 1 on *N.J.R.E.* 803(c)(6)(2007). Under the business records exception to the hearsay rule, a party seeking to admit a hearsay statement pursuant to this rule must demonstrate that "the writing [was] made in the regular course of business," the writing was "prepared within a short time of the act, condition or event being described," and "the source of the information and the method and circumstances of the preparation of the writing must justify allowing it into evidence." *State v. Matulewicz,* 101 *N.J.* 27, 29, 499 *A.*2d 1363 (1985) (citation omitted).

In 1974, this Court adopted *Rule* 5:12–4(d), which permits the Division "to submit into evidence, pursuant to *N.J.R.E.* 803(c)(6) and 801(d), reports by staff personnel or professional consultants." Further, "[c]onclusions drawn from the facts stated therein shall be treated as prima facie evidence, subject to rebuttal." *R.* 5:12–4(d). *N.J.R.E.* 803(c)(6) is the business-records exception to the hearsay rule and 801(d) defines the word business to "include[ ] every kind of business, institution, association, profession, occupation and calling, whether or not conducted for profit, and also includes activities of governmental agencies."

In the present case, the record does not permit a fair assessment as to whether the Screening Summary and the forms completed by Dr. Lewis would satisfy the standards for admissibility under *N.J.S.A.* 9:6–8.46(a)(3) and *Rule* 5:12–4(d). In respect of the form completed by Dr. Lewis, we acknowledge that "business records" can be "kept" in two distinct offices, such as a hospital and the state agency (Division). From the record, we cannot tell whether the hospital used the Division's referral form in the ordinary course of business in its emergency room department. We recognize, however, that the Division could have presented such proof if the issue had been raised at trial.

Similarly, because the Division was not required to demonstrate that its Screening Summary was created in the regular course of business of the Division, it did not have the opportunity

to satisfy that requirement. As previously noted, all of the exhibits were admitted into evidence without objection, and the Division was never required to attempt to satisfy the conditions necessary for the admission of the documents, including whether Dr. Lewis was a "professional consultant" consistent with that term in *Rule* 5:12–4(d). We add that the Appellate Division adopted an exceedingly narrow definition of a consultant, one which we view as untethered to the purpose of the *Rule* that recognizes the Division's need to secure the services of a range of professionals when investigating a claim of child abuse. The Division's use of a disinterested treating physician is not inconsistent with the purpose of the *Rule*.

Lastly, we recognize that similar to the procedure reasonably followed by defense counsel herein, a party may always agree to the admission of documents without the necessity of the Division's compliance with the strictures of the Rules.

## VI.

The judgment of the Appellate Division is reversed.

*For reversal*—Chief Justice RABNER and Justices LONG, LaVECCHIA, ALBIN, WALLACE, RIVERA–SOTO and HOENS—7.

*Opposed*—None.