**RECORD IMPOUNDED**

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet this opinion is binding only on the
parties in the case and its use in other cases is limited. R.1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3838-15T4
             A-4496-15T4

NEW JERSEY DIVISION OF
CHILD PROTECTION AND
PERMANENCY,

    Plaintiff-Respondent,

v.

R.A.B. and S.C.P.,

    Defendants-Appellants.
_____

IN THE MATTER OF THE
GUARDIANSHIP OF L.A.C.B.
and R.A.B. JR., minors.

_____

                Submitted April 27, 2017 — Decided June 2, 2017

                Before Judges Lihotz, Hoffman and Mawla.

                On appeal from Superior Court of New Jersey,
                Chancery Division, Family Part, Essex County,
                Docket No. FG-07-208-15.

                Joseph R. Krakora, Public Defender, attorney
                for appellant R.A.B. (Richard Foster,
                Assistant Deputy Public Defender, on the
                briefs).

Joseph R. Krakora, Public Defender, attorney for appellant S.C.P. (Mark E. Kleiman, Designated Counsel, on the briefs).

Christopher S. Porrino, Attorney General, attorney for respondent (Andrea M. Silkowitz, Assistant Attorney General, of counsel; Mary L. Harpster, Deputy Attorney General, on the brief).

Joseph R. Krakora, Public Defender, Law Guardian attorney for minors (Rachel E. Seidman, Assistant Deputy Public Defender, on the brief).

PER CURIAM

Defendants R.A.B. (Roger) and S.C.P. (Sally) appeal from the Family Part's April 26, 2016 guardianship judgment terminating their parental rights to L.A.C.B. (Lauren) and R.A.B., Jr. (Raymond).[1] In 2004, Roger pled guilty to a single count of sexual assault, N.J.S.A. 2C:14-2(b), after he admitted to sexually assaulting his minor cousin hundreds of times. In 2011, the Chancery Division appointed a guardian for Sally because she "adaptively functions at the level of a [nine-year-seven-month] old individual." When the Division of Child Protection and Permanency (Division) evaluated Sally, it found she lacked the psychological capacity to care for her children independently, even with additional training and therapy; in addition, she insisted her children were safe around Roger because she refused

---

[1] We use pseudonyms to protect the parties' privacy and for ease of reference.

to believe he ever sexually assaulted his cousin. Sally married Roger after the Division obtained custody of the children but before the trial court entered the guardianship judgment under review.

On appeal, defendants individually argue the trial judge erred in finding the Division satisfied the four prongs of the best interests standard for termination of parental rights. Following our review of the record, we reject these arguments and affirm.

I.

We discern the following facts from the record. Roger was ten years old when his female cousin was born on December 5, 1993. After his 2003 arrest, Roger admitted to sexually assaulting the cousin when she was as young as two years old. He continued to sexually assault her until at least December 24, 2001, when he was eighteen years old, and she was eight. He admitted he sexually assaulted her "a couple hundred times."

In April 2004, Roger pled guilty to one count of second-degree sexual assault, N.J.S.A. 2C:14-2(b), and received a three-year prison term. The court also sentenced him to community supervision for life, which required him to refrain from initiating or attempting to initiate, establish, or maintain contact with any

minor. The community supervision also required Roger to refrain from residing with any minor without his parole officer's approval.

Prior to sentencing, psychologist Jeffrey C. Singer, Ph.D., examined Roger. Testing showed Roger has an I.Q. of seventy, which corresponds to the second percentile. Dr. Singer noted, "This quotient is associated with the 'Poor', or 'Borderline', range of intellectual functioning." Roger "maintained his innocence despite having pled guilty, under oath, calling into question his understanding of his guilty plea." Dr. Singer nevertheless found "insufficient psychological evidence generated in the present evaluation to support a finding of sexual compulsivity. Therefore, [Roger] does not appear eligible for sentencing under the purview of the New Jersey Sex Offender Act."

In 2004, Virginia's Juvenile and Domestic Relations District Court terminated Roger's parental rights of his daughter with another woman. Virginia's Court of Appeals upheld the termination.

In January 2011, the Chancery Division ordered and adjudged Sally as "an incapacitated person and . . . unfit and unable to govern herself and manage her affairs with respect to medical decisions that require informed consent, legal matters, residential decisions, vocational decisions and educational decisions but [Sally] shall be permitted to make socialization

4

decisions independently."  The court appointed the Bureau of Guardianship Services as "guardian of the person of [Sally]."

The court relied on the expertise of psychologist Nicole J. Livingston, Ph.D., to support its order.  In her February 20, 2009 report, Dr. Livingston concluded Sally "functions in the moderately retarded range," "reads at the second grade level, and overall adaptively functions at the level of a [nine-year-seven-month] old individual."  Dr. Livingston therefore concluded Sally "is able to perform some activities of daily living without assistance, yet she lacks the ability to understand a legal contract, budget money, travel independently, make change independently, or provide medical informed consent."

In early September 2014, a Newark Beth Israel Medical Center social worker reported to the Division that Sally had given birth to Lauren.  A Division investigator determined Roger was Lauren's father and went to the hospital to interview Roger and Sally. Roger explained the couple intended to go to his mother's house after the hospital discharged Sally and Lauren.  The Division put Lauren on "social hold," preventing the hospital from discharging Lauren to her parents, because the Division needed to complete further assessments of both Roger and Sally.

Three days later, the Division met with Roger, Sally, Roger's mother, and two other family members.  Roger's mother and another

family member offered to care for Lauren, but background checks showed the Division had substantiated them for physical abuse, so it did not accept their offers. Roger's background check showed his conviction for sexually assaulting his cousin, and its consequent restriction on residing with minors. When the investigator called the Division of Developmental Disabilities, she learned "a past psychological evaluation . . . determined that [Sally] is unable to parent independently."

The Division concluded Lauren would "not be safe while in the care of" Roger and Sally. It "established" Roger's and Sally's abuse or neglect of Lauren, and the Chancery Division granted it care, custody, and supervision of Lauren on October 1, 2014. The court granted Sally supervised visitation. The court denied Roger visitation because of his sexual assault conviction, but informed him he could obtain visitation if he proved it was in Lauren's best interest, pursuant to N.J.S.A. 9:2-4.1(a). The Division placed Lauren in one of its resource homes.

In December 2014, psychologist Alison Strasser Winston, Ph.D., evaluated Sally "for . . . her parenting capacity." Dr. Winston concluded Sally "has significant cognitive deficits [that] would interfere with her ability to provide [Lauren] with appropriate care, supervision[,] and protections, and . . . she is either minimizing or demonstrates no insight into the extent

6

or impact of her cognitive limitations." "It is extremely concerning that [Sally] has remained in a prolonged relationship with a convicted sexual offender, and . . . she has indicated that she has no qualms of leaving her infant daughter alone in [Roger's] care in the event that [Lauren] returned to her care." "Although [Sally] may benefit from addressing her poor judgment in the context of psychotherapy, her cognitive deficits appear to be so extensive that she would not be able to make any substantive improvements in this domain within a time frame that would meet her daughter's need for permanency."

Dr. Winston also found Sally "appears incapable of independently caring for a child without significant support from others." Sally "appears to have unrealistic expectations about the requirements of childcare, and also appears to be overestimating her cognitive abilities and her ability to meet the demands of raising a child." She "would benefit from completing parenting classes to provide her with more accurate and comprehensive knowledge of child development and to enhance her arsenal of effective disciplinary strategies in order to reduce her level of risk to her daughter." Dr. Winston nevertheless concluded, "[I]n light of her significant cognitive limitations, [she] is unlikely to retain any of the materials that would be

presented for a sustained period of time, and would not reduce her level of risk to [Lauren] to any substantive degree."

Dr. Winston ultimately concluded, "[W]ithin a reasonable degree of psychological certainty, [Sally] is currently incapable of providing her daughter with a safe and stable environment at the present time, nor is there any indication that she will be able to do so within the foreseeable future." Dr. Winston therefore recommended "other permanency planning for [Lauren] besides reunification with her birth parents."

On January 7, 2015, the Chancery Division conducted a fact finding trial regarding the Division's claim that Roger abused or neglected Lauren. The court found Roger knew his sexual assault conviction prevented him from having custody of Lauren, and he also knew Sally was incapable of properly caring for her. Because he failed to make other plans for her care, the court concluded Roger put her at imminent risk, constituting abuse or neglect. The same day, the court relieved the Division of its obligation to provide reasonable efforts to reunify Lauren with Roger because the Virginia court had previously involuntarily terminated his parental rights to his older daughter. See N.J.S.A. 30:4C-11.3(c).

On January 14, 2015, Lauren began living with her foster parent, who is committed to adopting her. On January 29, 2015, the Chancery Division accepted the Division's permanency plan of

termination of parental rights followed by adoption. On March 10, 2015, the Division filed a complaint for guardianship of Lauren.

One month before the Division filed its complaint, Sally began a parent education program. After attending eight group sessions and one individual session, Sally completed the parent education program in May 2015.

Sally gave birth to Raymond in July 2015. The Division learned of Raymond's birth the next day. Sally initially denied Roger was Raymond's father, but eventually admitted the fact. The court awarded the Division custody of Raymond on July 23, 2015. As with Lauren, the court denied Roger visitation with Raymond and relieved the Division of its obligation to provide reasonable efforts to reunify Roger with Raymond.

The Division placed Raymond in a resource home willing to adopt him. In August 2015, the Division added Raymond to Sally's visits with Lauren. The Division contacted the family four times to arrange a family team meeting, but they refused each time.

On September 23, 2015, the Chancery Division approved the Division's plan to terminate Roger's and Sally's parental rights to Raymond. The Division amended its guardianship complaint to include Raymond on October 27, 2015. By January 19, 2016, Sally had missed three consecutive visits with Lauren and Raymond, so the visitation program terminated her participation.

On January 26, 2016, Sally confirmed she had recently married Roger. The same day, the court ordered Roger and Sally to undergo evaluations. The court had previously ordered them to undergo evaluations on October 28 and December 17, 2015. On February 4, 2016, Dr. Winston completed a bonding evaluation between Sally and her two children. Dr. Winston found Lauren and Raymond had an "insecure emotional attachment" to Sally. During the evaluation, Sally "interacted to a somewhat minimal extent with her children. She infrequently spoke to the children, and her statements to them consisted of questions that the children could not answer, playing 'Peek-A-Boo,' babbling, and cooing with them." The children "did not become distressed when [Sally] was briefly asked to leave the room." The children appeared as comfortable with Dr. Winston as with Sally, and they did "not appear to view [Sally] as a primary provider of their needs for nurturance, guidance, safety, and protection."

Dr. Winston also individually evaluated Sally. She found Sally's cognitive limitations "would significantly impair her ability to safely parent her children," noting she "demonstrates a significant lack of knowledge regarding issues pertaining to child development, appropriate care of children, relevant health and safety issues, and parenting skills." Although Sally "is clearly incapable of independently parenting her children, she

demonstrates no insight into her parental incapacity;" her "cognitive limitations have clearly impacted on her judgment as she is unable to accurately ascertain which individuals could pose a risk of harm to her young children and would consequently place them at a significant risk if they were returned to her care." Dr. Winston specifically noted Sally's belief Roger never sexually assaulted his cousin.

Dr. Winston also evaluated Roger on February 4, 2016. She stated Roger continued to deny he sexually assaulted his cousin, and found Roger "lacks empathy and reverses parent-child roles." She further noted, "He may be at elevated risk of engaging in physically abusive behavior towards his children." Roger also "expressed the belief that [Sally] is capable of caring for their two young children on her own." Dr. Winston found this belief "raises further concern about [Roger's] judgment and his ability to provide the children with a safe and stable environment." She also found:

> It is imperative that [Roger] engage in individual psychotherapy with a clinician skilled in working with individuals accused of engaging in sexually-offending behavior to address his history of childhood sexual abuse, the allegation that he had molested his cousin, and the impact of these factors on his ability to provide his children with a safe and stable environment. It should be noted that [Roger] appears to have longstanding issues which have never been addressed in a therapeutic context and will take a prolonged

period of time to adequately address. It is extremely unlikely that his compliance with psychotherapy would result in meaningful therapeutic progress within an appropriate time frame to meet his children's need for permanency.

Dr. Winston therefore recommended the Division and the court view both Sally and Roger

as having failed to achieve permanency on behalf of their children . . . . Neither parent is currently capable of providing a safe and stable environment for their children, nor is there any indication that either parent might be able to provide the children with a safe and stable environment in the foreseeable future. Moreover, neither of the children has a strong and secure emotional attachment to their biological parents.

Dr. Winston consequently recommended the termination of defendants' parental rights, so the children could be adopted.

On March 3, 2016, Dr. Winston evaluated Lauren's resource parent. Dr. Winston noted Lauren had lived with the resource parent since January 2015 and now views the resource parent as "her psychological parent." The resource parent "has expressed commitment to adopting [Lauren] and is able to provide the child with a nurturing, safe[,] and stable environment, allowing her to develop a sense of permanency." "Findings from the assessment of attachment indicate that [Lauren] has a strong and secure emotional attachment to her resource parent, who has been her primary

caregiver for the past [fourteen] months." Dr. Winston ultimately concluded:

> In light of the facts that [Lauren] is currently in a safe and stable environment and has a strong attachment to [her resource parent], it is [my] opinion . . ., within a reasonable degree of psychological certainty, that it would be in [Lauren's] best interests for the [c]ourt to proceed with termination of [Roger's and Sally's] parental rights followed by adopted of [Lauren] by [her resource parent].

At a pretrial hearing on March 24, 2016, two weeks before the the guardianship trial, Roger's counsel informed the court that Roger had missed the July 2015 appointment for his evaluation with a defense expert for the termination proceeding. The court said it would allow the Division to present its case as scheduled, and Roger could present his expert when the Division presented its plans for adoption on April 26, 2016.

On April 6, 7, and 26, 2016, the court conducted the trial. On the second day of trial, Roger's counsel told the court that an expert would evaluate Roger on April 12, 2016. Over the three trial days, the Division presented three witnesses: Dr. Winston, a Division caseworker, and a Division supervisor. The court found them all credible. Defendants did not testify, present experts, or introduce any documentary evidence into the record. Notably, Roger declined to present any expert testimony. The Law Guardian for the children supported terminating the parental rights of each

parent. On the last day of trial, the court issued its oral decision terminating the parental rights of both defendants. This appeal followed.

## II.

Our review of the Family Part judge's findings and decision to terminate parental rights is limited. N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 278-79 (2007). We will not reverse the family court's termination decision "when there is substantial credible evidence in the record to support the court's findings." N.J. Div. of Youth & Family Servs. v. E.P., 196 N.J. 88, 104 (2008). "[B]ecause of the family courts' special jurisdiction and expertise in family matters, appellate courts should accord deference to family court factfinding." N.J. Div. of Youth & Family Servs. v. M.C. III, 201 N.J. 328, 343 (2010) (quoting Cesare v. Cesare, 154 N.J. 394, 413 (1998)).

However, we should not grant deference to the Family Part if the judge's findings "went so wide of the mark that the judge was clearly mistaken." N.J. Div. of Youth & Family Servs. v. G.L., 191 N.J. 596, 605 (2007). The trial judge's legal conclusions, and the application of those conclusions to the facts, are subject to plenary review. Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995).

Parents have a fundamental right to raise their biological children. In re Guardianship of K.H.O., 161 N.J. 337, 346-47 (1999); see also Santosky v. Kramer, 455 U.S. 745, 753, 102 S. Ct. 1388, 1394-95, 71 L. Ed. 2d 599, 606 (1982) (stating that parents have a liberty interest in raising their children). However, these rights are not absolute; the State has a responsibility to protect the welfare of children, which is achieved by the "best interests of the child standard." K.H.O., supra, 161 N.J. at 347. This standard is codified at N.J.S.A. 30:4C-15.1(a) and requires the State to establish each of the following four elements by clear and convincing evidence before parental rights may be severed:

> (1) The child's safety, health, or development has been or will continue to be endangered by the parental relationship;
>
> (2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from his resource family parents would cause serious and enduring emotional or psychological harm to the child;
>
> (3) The division has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and

> (4) Termination of parental rights will not
> do more harm than good.

These four prongs "relate to and overlap with one another to provide a comprehensive standard that identifies a child's best interests." K.H.O., supra, 161 N.J. at 348. The considerations involved are fact-sensitive and require particularized evidence addressing the specific circumstances present in each case. N.J. Div. of Youth & Family Servs. v. I.S., 202 N.J. 145, 168 (2010).

The first prong of the best interest standard requires the harm shown by the parental relationship "must be one that threatens the child's health and will likely have continuing deleterious effects on the child." K.H.O., supra, 161 N.J. at 352. This prong may be triggered by an "accumulation of harms over time." N.J. Div. of Youth & Family Servs. v. P.P., 180 N.J. 494, 506 (2004). Generally, the proofs "focus on past abuse and neglect and on the likelihood of it continuing." N.J. Div. of Youth & Family Servs. v. F.H., 389 N.J. Super. 576, 609 (App. Div.) (quoting In re Guardianship of J.C., 129 N.J. 1, 10 (1992)), certif. denied, 192 N.J. 68 (2007). The child's harm may also result from the parents' withdrawal of care, nurturing, and solicitude for an extended period of time, In re Guardianship of D.M.H., 161 N.J. 365, 379 (1999), or if the parents are unable to protect and care for the child. N.J. Div. of Youth and Family Servs. v. A.G., 344 N.J. Super. 418, 434-35 (App. Div. 2001),

certif. denied, 171 N.J. 44 (2002). Furthermore, "[c]ourts need not wait to act[,]" with respect to termination of parental rights, "until [the] child is actually irreparably impaired by parental inattention or neglect." D.M.H., supra, 161 N.J. at 383.

The second prong of the best-interest test relates to parental unfitness. K.H.O., supra, 161 N.J. at 352. It requires the State demonstrate the parent is "'unwilling or unable to eliminate the harm' that has endangered the child's health and development," or the parent "has failed to provide a 'safe and stable home for the child' and a 'delay in permanent placement' will further harm the child." Ibid. (quoting N.J.S.A. 30:4C-15.1(a)(2)). The trial court is required to determine whether it is "reasonably foreseeable that the parents can cease to inflict harm upon the children entrusted to their care." N.J. Div. of Youth & Family Servs. v. A.W., 103 N.J. 591, 607 (1986).

Prong three of the best interests test contains two parts. The first part requires the Division show it made "reasonable efforts to provide services to help the parents correct the circumstances that led to the child's placement outside the home." M.M., supra, 189 N.J. at 281. These efforts should focus on reunification of the family. K.H.O., supra, 161 N.J. at 354. "Reasonable efforts" under the statue include:

> (1) consultation and cooperation with the parent in developing a plan for appropriate services;
>
> (2) providing services that have been agreed upon, to the family, in order to further the goal of family reunification;
>
> (3) informing the parent at appropriate intervals of the child's progress, development, and health; and
>
> (4) facilitating appropriate visitation.
>
> [N.J.S.A. 30:4C-15.1(c).]

Whether the Division acted appropriately must be decided "with reference to the circumstances of the individual case before the court, including the parent's active participation in the reunification effort." D.M.H., supra, 161 N.J. at 390.

To satisfy the fourth prong, the Division must prove by clear and convincing evidence that "[t]ermination of parental rights will not do more harm than good." N.J.S.A. 30:4C-15.1(a)(4). The court must determine "whether a child's interest will best be served by completely terminating the child's relationship with that parent." E.P., supra, 196 N.J. at 108. "The crux of the fourth statutory subpart is the child's need for a permanent and stable home, along with a defined parent-child relationship." N.J. Div. of Youth & Family Servs. v. H.R., 431 N.J. Super. 212, 226 (2013).

N.J.S.A. 9:2-4.1(a) nevertheless states:

> Notwithstanding any provision of law to the contrary, a person convicted of sexual assault under [N.J.S.A.] 2C:14-2 shall not be awarded the custody of or visitation rights to any minor child, including a minor child who was born as a result of or was the victim of the sexual assault, except upon a showing[,] by clear and convincing evidence[,] that it is in the best interest of the child for custody or visitation rights to be awarded.

## A. Roger

Roger argues the Division failed to prove any of the prongs of the best-interest test because he did not harm Lauren or Raymond when he failed to obtain custody of them pursuant to N.J.S.A. 9:2-4.1(a). We disagree.

Roger first asserts his case is readily distinguishable from D.M.H., supra, 161 N.J. at 379, in which our Supreme Court held, "A parent's withdrawal of . . . solicitude, nurture, and care for an extended period of time is in itself a harm that endangers the health and development of the child." In D.M.H., the father refused to acknowledge paternity or request custody while his child lived with her homeless mother, who neglected her and abused drugs. Id. at 379-80. The father also declined to protest when the Division placed another of his children in foster care. Id. at 380. "Outside of occasional visits, [the father] never provided [his child] with any paternal care, nurture, or support." Ibid.

Contrary to Roger's argument, his inaction was similar to the father's in D.M.H. He knew of Sally's pregnancy, and he knew the

19

restrictions on his contact with minors. Nevertheless, he never made any serious effort to obtain custody of either child, by "showing[,] by clear and convincing evidence[,] that it is in the best interest of the child for custody or visitation rights to be awarded." N.J.S.A. 9:2-4.1(a). Moreover, the trial record is devoid of any evidence he would have succeeded. The trial court allowed him to undergo an evaluation to present a defense of his parental rights, but he declined to attend the first evaluation, and the record does not reflect he attended the second appointment.

Roger now argues he never properly requested a hearing because his counsel was unconstitutionally ineffective. To establish ineffective assistance of counsel, a defendant must satisfy the two-pronged test enunciated by the United States Supreme Court in the companion cases of Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), and United States v. Cronic, 466 U.S. 648, 104 S. Ct. 2039, 80 L. Ed. 2d 657 (1984); see also State v. Fritz, 105 N.J. 42, 58 (1987) (adopting Strickland's two-pronged test). To establish a prima facie case of ineffective assistance of counsel, a defendant must prove:

> First, . . . counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were

> so serious as to deprive the defendant of a
> fair trial, a trial whose result is reliable.
>
> [Strickland, supra, 466 U.S. at 687, 104 S.
> Ct. at 2064, 80 L. Ed. 2d at 693.]

These standards have been applied to guardianship matters. N.J. Div. of Youth & Family Servs. v. B.R., 192 N.J. 301, 307-08 (2007).

Roger had two attorneys during this case. Roger argues the first was ineffective because the attorney never asked the court for a hearing, pursuant to N.J.S.A. 9:2-4.1(a). Roger states his first attorney failed to obtain the hearing because the attorney was preoccupied with a federal criminal trial that could last two to four months. His first attorney, however, stopped representing him once the federal criminal trial began, and his second attorney took over. Roger argues his second attorney did not understand N.J.S.A. 9:2-4.1(a) because she said, "[A]s far as parole was concerned my client could have contact with children if he was supervised." He also notes his second attorney asked the Division caseworker whether the Division ever scheduled a best interest evaluation for Roger.

We are not convinced Roger received ineffective assistance of counsel. His first attorney did not request a hearing pursuant to N.J.S.A. 9:2-4.1(a), because Roger had not undergone an evaluation to support a court order granting him custody of his children. His first attorney scheduled an evaluation for him on

July 27, 2015, but Roger failed to attend the appointment. His second attorney scheduled another evaluation for him on April 12, 2016. The record does not show whether Roger went to this evaluation because his second attorney did not introduce a report or present the expert at trial. Most likely, either Roger did not attend the evaluation, or the evaluation did not support granting him custody or visitation. Both attorneys declined to ask for a hearing seeking custody or visitation before they had an expert to support the application. Neither attorney "made errors so serious" that they were "not functioning as the 'counsel' guaranteed by the Sixth Amendment." Strickland, supra, 466 U.S. at 687, 104 S. Ct. at 2064, 80 L. Ed. 2d at 693; see also B.R., supra, 192 N.J. at 307-08.

Roger next argues, "Dr. Winston was not an expert in sexual offenders, and it was improper for her to render an opinion as to the import of [Roger's] denials of guilt, as well as a conclusion that the children would be at risk of sexual abuse if reunited with their parents." The admissibility of expert testimony is committed to the sound discretion of the trial court. Townsend v. Pierre, 221 N.J. 36, 52 (2015). A trial court's grant or denial of a motion to preclude expert testimony is entitled to deference on appellate review. Ibid. The New Jersey Supreme Court has instructed us to "apply [a] deferential approach to a trial court's

decision to admit expert testimony, reviewing it against an abuse of discretion standard." Id. at 53 (alteration in original) (quoting Pomerantz Paper Corp. v. New Cmty. Corp., 207 N.J. 344, 371-72 (2011)).

N.J.R.E. 702 and 703 frame our analysis for determining the admissibility of expert testimony. N.J.R.E. 702 identifies when expert testimony is permissible and requires the experts to be qualified in their respective fields. N.J.R.E. 703 addresses the foundation for expert testimony. Expert opinions must "be grounded in 'facts or data derived from (1) the expert's personal observations, or (2) evidence admitted at the trial, or (3) data relied upon by the expert which is not necessarily admissible in evidence but which is the type of data normally relied upon by experts.'" Townsend, supra, 221 N.J. at 53 (quoting Polzo v. Cnty. of Essex, 196 N.J. 569, 583 (2008)).

"The net opinion rule is a 'corollary of [N.J.R.E. 703] . . . which forbids the admission into evidence of an expert's conclusions that are not supported by factual evidence or other data.'" Id. at 53-54 (alteration in original) (quoting Polzo, supra, 196 N.J. at 583). Therefore, an expert is required to "'give the why and wherefore' that supports the opinion, 'rather than a mere conclusion.'" Id. at 54 (quoting Borough of Saddle River v. 66 E. Allendale, LLC, 216 N.J. 115, 144 (2013)). The net

23

opinion rule directs "that experts 'be able to identify the factual bases for their conclusions, explain their methodology, and demonstrate that both the factual bases and the methodology are reliable.'" Id. at 55 (quoting Landrigan v. Celotex Corp., 127 N.J. 404, 417 (1992)). In short, the net opinion rule is "a prohibition against speculative testimony." Harte v. Hand, 433 N.J. Super. 457, 465 (App. Div. 2013) (quoting Grzanka v. Pfeifer, 301 N.J. Super. 563, 580 (App. Div. 1997), certif. denied, 154 N.J. 607 (1998)).

Dr. Winston's curriculum vitae states the New Jersey Child Abuse Training Institute granted her an "Advanced Studies in Child Maltreatment Certificate with a specialization in Child Sexual Abuse." Fordham University granted her a Ph.D. in clinical psychology, and she is a licensed psychologist in New Jersey and New York. Dr. Winston met with Roger and was qualified to opine on the psychological import of Roger's denial of guilt and on whether he posed a risk to his children. See N.J.R.E. 702, 703.

Lastly, Roger argues the State of Virginia terminated his parental rights under a statute that did not require it to provide him with reasonable services, so the trial court should not have relieved the Division of its obligation to provide reasonable efforts to reunify him with his children. N.J.S.A. 30:4C-11.3(c) states:

> In any case in which the Division of Child
> Protection and Permanency accepts a child in
> care or custody, including placement, the
> division shall not be required to provide
> reasonable efforts to reunify the child with
> a parent if a court of competent jurisdiction
> has determined that . . . [t]he rights of the
> parent to another of the parent's children
> have been involuntarily terminated.

N.J.S.A. 30:4C-11.3(c) does not limit its application to parents who had their parental rights previously terminated in accordance with New Jersey law or public policy, and we decline to read this qualification into the statute. For this reason, we also reject Roger's argument that his counsel was ineffective for failing to raise this argument at trial.

Although ultimately not essential to our decision, we previously granted Roger's motion to supplement the record with a psychologist's December 2, 2016 report finding him unlikely to "commit another sexual offense." Obviously, this report was not before the trial court. Moreover, Dr. Winston's conclusions did not turn on whether Roger had a likelihood of recidivism as a sexual offender. The report also fails to show Lauren's or Raymond's best interests require "custody or visitation to be awarded." N.J.S.A. 9:2-4.1(a).[2]

---

[2] The Division also filed motions to supplement the record with an additional report of its own and a Family Part order regarding Roger and Sally's third child. We deny these motions because the additional report and court order are unnecessary to our

## B. Sally

A court's decision to terminate a parent's rights must rest on the child's best interest and the child's need for protection and permanency; the court's decision must not be skewed by the sympathy for the blamelessness of a parent facing circumstances he or she has not caused. A.G., supra, 344 N.J. Super. at 438-39. "[T]o allow the provisions of the [LAD] and ADA to constitute a defense to a termination proceeding would improperly elevate the rights of the parent above those of the child." Id. at 442. "Reliance upon the LAD [and the ADA] would change the focus of the termination case from the best interests of the child to the rights of the parent." Id. at 441.

Sally first argues, "In the case at bar, the trial court essentially found that [she] 'harmed' both children by virtue of her being deemed incapacitated in 2011; thus, the court believed [she] was incapable of caring for herself or her children." The record does not support this contention. The Division individually and separately evaluated Sally twice: once regarding Lauren, and again regarding both Lauren and Raymond. Both times, Dr. Winston found Sally psychologically incapable of independently caring for children while refusing to recognize her cognitive limitations.

_____

determination of this case. See Liberty Surplus Ins. Corp. v. Nowell Amoroso, P.A., 189 N.J. 436, 452-53 (2007).

Further, she insisted she would leave her children with Roger, in spite of his prior admission to sexually assaulting his cousin hundreds of times. Sally's mental disability, her refusal to acknowledge her limitations, and her obstinate insistence on Roger's innocence, all "threaten[ed]" her children's health and would "likely have continuing deleterious effects on" them. See K.H.O., supra, 161 N.J. at 352.

Sally next argues, "[T]he court disregarded evidence . . . demonstrating [her] desire and potential for developing the skills necessary to care for her children with proper support . . . ." Again, the record does not support this contention. Dr. Winston testified Sally "remains incapable of providing a safe and stable environment for her children[,] [a]nd . . . she would not be able to remediate those concerns within a time frame that would meet the children's need for permanency." The trial court found Dr. Winston credible, and Sally did not present any evidence to the contrary.

Sally also contends the Division "failed to provide [her] with an individualized assessment or reasonable accommodations for services under the ADA in light of her cognitive limitations, which have necessitated the appointment of a legal guardian to assist her with certain decisions." She cites PGA Tour Inc. v. Martin, 532 U.S. 661, 690, 121 S. Ct. 1879, 1897, 149 L. Ed. 2d

27

904, 928 (2001), for the proposition that the ADA requires "the need of a disabled person be evaluated on an individual basis." Although this court has explicitly rejected the ADA or LAD as defenses to the termination of a parent's rights, A.G., supra, 344 N.J. Super. at 442, the record shows the Division individually evaluated Sally's ability to parent her children twice. As already noted, the Division found her unfit and beyond its help. We therefore reject Sally's last argument that "the court's determination on the fourth prong was 'wide of the mark' and should be reversed in light of the Division's failure to offer appropriate remedial services."

Any arguments not specifically addressed in this opinion lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION