# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3290-16T2

NEW JERSEY DIVISION OF
CHILD PROTECTION AND
PERMANENCY,

    Plaintiff-Respondent,

v.

A.B.-H.,

    Defendant-Appellant,

and

R.H., W.T. and W.C.,[1]

    Defendants.

_____

IN THE MATTER OF A.T., C.C.
and L.H.,

    Minors.

_____

        Submitted May 9, 2018 — Decided  June 8, 2018

        Before Judges Manahan and Suter.

---

[1]  No findings were made as to W.T. and W.C., the natural fathers of Amanda and Clara, respectively, therefore they are not parties to this appeal.

On appeal from Superior Court of New Jersey, Chancery Division, Family Part, Hudson County, Docket No. FN-09-0361-16.

Joseph E. Krakora, Public Defender, attorney for appellant (Thomas G. Hand, Designated Counsel, on the briefs).

Gurbir S. Grewal, Attorney General, attorney for respondent (Jason W. Rockwell, Assistant Attorney General, of counsel; Sara M. Gregory, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minors A.T., C.C., and L.H. (Lisa M. Black, Designated Counsel, on the brief).

PER CURIAM

Defendant A.B.-H. (Alice) appeals from a November 29, 2016 order finding that she abused and neglected her daughter A.T. (Amanda) by failing to protect Amanda from sexual abuse by the child's stepfather, R.H. (Ronald), therefore placing her child at substantial risk of harm pursuant to N.J.S.A. 9:6-8.21(c)(4)(b).[2] We affirm.

The New Jersey Division of Child Protection and Permanency (Division) became involved with the family on February 22, 2016, after receiving a referral from a staff member at Amanda's school reporting that Amanda, then fifteen years old, had a swollen left

_____

[2] Pursuant to Rule 1:38-3(d)(12) and Rule 5:12-1, we use initials and fictitious names of the family members for purpose of confidentiality.

cheek and slight bruising under her left eye caused by a physical altercation with her mother and stepfather. According to the referral, Amanda stated that she was doing her daily chores when Ronald became enraged, telling her she was not doing a good job. Amanda's boyfriend intervened and tried to defend Amanda but he was put into a headlock by Ronald. Amanda attempted to pull Ronald off of her boyfriend. At that time, Alice approached Amanda and hit her in the face.

Amanda also reported that until approximately one year prior to this altercation, Amanda and Ronald had a good relationship until he inappropriately touched her, which made her uncomfortable. As a result of the referral, the Division opened an investigation into the allegations.

The Division sent a caseworker, Carla Sousa, to interview Amanda at her school. Amanda told Sousa that sometime in August 2015, while lying on her bed, Ronald shaved her genitals, touched her inappropriately with his finger and put his face "in her private area."

Amanda also told Sousa that a few months after this occurred, she told Alice about the incident. Alice confronted Ronald, who denied the allegations. A few weeks later, Ronald confronted Amanda and asked her why she told Alice about "their little secret." Ronald then purchased a vibrator for Amanda so that she

could "explore herself." Amanda stated that although Ronald continued to live in the home, he did not touch her inappropriately again.

After meeting with Amanda, Sousa conducted individual interviews with Amanda's sister Clara, and with Alice and Ronald. Clara reported that she witnessed her mother hit Amanda in the face. She further stated that Ronald never hit her or touched her inappropriately. Alice said that the altercation occurred because Amanda was not doing her chores correctly. After engaging in a verbal altercation, Alice stated that Amanda physically assaulted both her and Ronald. Ronald acknowledged that he had an altercation with Amanda. Sousa did not inquire about the sexual abuse. At the conclusion of the interviews, Alice and Amanda agreed that Amada should live with her aunt. Further, the Division implemented homemaker services in the family home to ensure the safety of the children.

On February 23, 2016, Detective Mark Sojak from the Hudson County Prosecutor's Office interviewed Amanda, Ronald and Alice. Amanda repeated the statements she made to Sousa and to school personnel confirming that Ronald purchased the vibrator for her and that she told her mother about Ronald's actions. She also confirmed Ronald shaved her and inappropriately touched her. Ronald admitted buying the vibrator for Amanda but denied shaving

4

Amanda's private area or any sexual contact with her. Alice confirmed that Amanda told her about the shaving incident but disregarded the accusations after Ronald denied them and because Amanda had a tendency to lie. When questioned by Sojak, Alice confirmed sexual practices between her and Ronald, including his shaving her private area. A no-contact order between Ronald and Amanda was put into place.

Subsequently, Ronald submitted to a polygraph test, which he failed. He was then arrested and charged with aggravated sexual assault, child abuse and endangering the welfare of a child. Amanda continued to reside with her aunt until the end of the school year. Afterward, it was her intention to reside with her maternal grandmother in South Carolina.

On March 10, 2016, Amanda underwent a psychological evaluation at The Audrey Hepburn Children's House (AHCH), a diagnostic child abuse center. Amanda discussed the allegations of sexual abuse with Dr. Elouise Berry, and stated that despite Alice's lack of support, she missed her mother and sisters and wanted to return home. Amanda admitted having thoughts of self-mutilation but said she had not acted upon those thoughts. She stated that prior to the incident she did not have any academic or social issues at school. Amanda further stated that since the

incident she felt self-conscious and was worried about her safety when around boys.

Following the clinical interview, Dr. Berry determined that Amanda experienced a significant level of anxiety due to the physical and sexual trauma and recommended Amanda participate in individual trauma-focused therapy as well as group therapy with Alice and her sisters. Dr. Berry further found the inappropriate sexual abuse by Ronald was "clinically supported" as was the allegation of "neglect-substantial risk of physical injury" by Alice.

Amanda attended a second evaluation for sexual and physical abuse at AHCH. At the conclusion of the evaluation, it was recommended that there be no contact between Ronald and Amanda until the completion of the investigation, and that Amanda submit to a follow-up medical exam if necessary.

On May 10, 2016, the Division filed a verified complaint for the protection, care and supervision of Amanda, Clara and their sister, Lauren, which also named Alice and Ronald as defendants. An order to show cause was conducted on May 31, 2016. At the conclusion of the hearing, the judge granted the Division care and supervision of the children pursuant to Title 30, based upon the allegations in the complaint of inappropriate sexual contact. The judge further ordered that Ronald would have supervised visitation

with his natural daughter Lauren, and would not be permitted to return to the residence in the event he was released from incarceration.

Thereafter, on June 16, 2016, at the return of the order to show cause hearing, the judge ordered Alice to attend a psychological evaluation, and individual and family counseling. Ronald was offered a psycho-social evaluation and individual counseling by the Division upon his release from incarceration.

A compliance review hearing was held on September 22, 2016. The judge ordered the Division assist with providing bunk beds so that the children could sleep separately and provide more living space, as well as a kitchen table and chairs, so that Alice and the children could receive in-home counseling services.

On October 24, 2016, Ronald pled guilty to second-degree endangering the welfare of a child after he admitted to purchasing the vibrator for Amanda and that he engaged in the act of shaving her.[3]

A Title 9 fact-finding commenced on November 9, 2016. The Division presented several witnesses, including Sousa and Dr.

_____

[3]  It was unclear during the plea articulation what area on Amanda he shaved.

Anthony Vincent D'Urso,[4] Supervising Psychologist at AHCH. On direct examination, Sousa stated that the Division received a referral in February 2016, in regards to the physical abuse of Amanda, then fifteen years old.

Sousa stated that she interviewed Amanda and that Amanda informed her during their initial interview that in addition to the physical abuse by Alice and Ronald, she had a "sexual encounter with her stepfather, [Ronald.]" Sousa testified:

> [Amanda] went to her bedroom and she had a sundress on, she laid on her bed and she put the TV on.
>
> At that point she said that [Ronald] came into the bedroom and . . . had taken off the blanket and had asked her if she had shaved her genitals. She then had said no and asked why he was asking her that. At that point [Ronald] had left the bedroom and then had returned to the bedroom several minutes later with a bowl of water and a straight razor.
>
> At that point [Amanda] said that . . . [Ronald] started shaving her genital areas. [Amanda] . . . asked him . . . why he was doing that and for him to stop, which he then proceeded to, according to [Amanda], put his finger on her clitoris and then put his face in her private area and asked her if she liked it. . . . [Amanda] had told him to get off of her and he did.

---

[4] Defense counsel stipulated to Dr. D'Urso's expert qualifications as a licensed psychologist.

A-3290-16T2

Upon further questioning regarding other concerns of sexual conduct, Sousa added:

> [Amanda] also had informed me that prior to that sexual contract [sic] [Ronald] . . . purchased her a vibrator and he had told her . . . that he would rather have her explore . . . herself rather than have sex with other males.

In terms of this particular episode, Sousa testified that Amanda "informed me that she did tell her mother about both incidents" and "that her mother, [Alice], that she smoke [sic] to [Ronald] about the incident and that [Ronald] had denied anything that had ever happened and that that was it."

Dr. D'Urso was the Division's second witness. He acknowledged his signature as a co-author on the evaluation of Amanda conducted by Dr. Berry that was marked for identification. Dr. D'Urso testified that Amanda was seen at AHCH based upon allegations of sexual abuse by Ronald, and allegations of "voyeuristic behavior." During his testimony, Dr. D'Urso explained the standard interview protocol that matches the developmental level of the child; the clinical interview process, which determines whether the child is able to understand simple rules and whether they understand the difference between a truth and a lie; and the differences in the disclosure process, which is generally described as "accidental" when dealing with younger children and "purposeful" with older

children.  With regard to Amanda, Dr. D'Urso determined she had an adequate understanding of rules, truths and lies, and that she ultimately made purposeful disclosures in terms of the sexual behavior of Ronald.

Dr. D'Urso testified that Amanda "had disclosed the incidents [to her mother] earlier in the fall of 2015 according to her." Dr. D'Urso also stated although Alice agreed that buying the vibrator was inappropriate, she was "consistently ambivalent about the truthfulness of the sexual behavior that existed." Dr. D'Urso further testified that regardless of Amanda's disclosure, Alice did not limit access to Amanda and permitted Ronald to "remain[] living in the home and serve[] as a parent."

Dr. D'Urso opined that both the sexual and physical abuse allegations were clinically supported by

> acts that were corroborated, purchase of a vibrator, involvement with [Ronald]. . . . There was some concern about sexualized behavior that sh[e] might be engaged in, so there was a context to understand some sexual behavior.
>
> There was the initiation of something that was recognized, the vibrator for purposes of sexual exploration . . . . And then there were further statements about sexual behavior that existed between [Amanda] and [Ronald] where she gave us some detail that existed between the parents, who both acknowledged that she should be unaware of the kind of activity in the household.

.  .  .  .

So the factors that we would look for clinical supports . . . so there is detail, there is a lack [of] fabrication or a motive to fabricate, I should say. There was some sexualized behavior that was acknowledged or some initiating behavior that was acknowledged. There was some idiosyncratic detail. There was affect. She . . . had emotional reactivity.

In an oral decision, the judge determined that Alice did neglect or abuse her daughter by failing to protect her after she was informed by Amanda of the sexual abuse by Ronald. The judge found that these actions or inactions placed all of her children at a substantial risk of harm pursuant to N.J.S.A. 9:6-8.21(c)(4)(b). With regard to Alice, the judge held:

[Alice] never reached out for help for that child. She was inconsistent in testifying that she allowed him to shave [Amanda's] legs on graduation day, she was present, but she also testified she would have broken his neck even just for shaving his [sic] legs if she hadn't given him permission to do it.

Basically, [Alice] was totally incredible. She lacked credibility. . . . She didn't believe her daughter, despite sitting here listening to her husband articulate the facts of a second-degree child endangering guilty plea.

The judge further held:

. . . [Alice] fail[ed] to protect that child. She never called the Division, she didn't seek counseling, she didn't get [Ronald] out of the

11

> house, and she still is willing to let him
> come home. She not only failed to protect
> that child but she really contributed to the
> problems and certainly poses a risk of harm
> to that child. She's shown she's not going
> to protect her.

The judge further held that Ronald's conduct fit within the definition of sexual abuse and neglect and that he "told us so under oath, so that's . . . uncontested."

After considering the proofs, the judge concluded that the Division had established abuse and neglect by a preponderance of the evidence against Alice.

On appeal, Alice argues the trial court erred in finding that she committed an act of abuse or neglect against Amanda because no credible evidence was provided to support the trial court's findings.[5] We disagree.

Our review of the court's factual finding of neglect is limited; we defer to the court's determinations "when supported by adequate, substantial, credible evidence." N.J. Div. of Youth & Family Servs. v. I.Y.A., 400 N.J. Super. 77, 89 (App. Div. 2008) (quoting Cesare v. Cesare, 154 N.J. 394, 411-12 (1998)). The trial court is best suited to assess credibility, weigh testimony, and develop a feel for the case, and we extend special deference to the Family Part's expertise. N.J. Div. of Youth & Family Servs.

---

[5] A similar argument was raised by Alice in her reply brief.

v. M.C. III, 201 N.J. 328, 342-43 (2010); Cesare, 154 N.J. at 412-13. Unless the trial judge's factual findings "went so wide of the mark that a mistake must have been made," N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 279 (2007) (quoting Snyder Realty, Inc. v. BMW of N. Am., Inc., 233 N.J. Super. 65, 69 (App. Div. 1989)), they should not be disturbed, even if we would not have made the same decision if we had heard the case in the first instance. See Clark v. Clark, 429 N.J. Super. 61, 71 (App. Div. 2012). "It is not our place to second-guess or substitute our judgment for that of the family court, provided that the record contains substantial and credible evidence to support" the judge's decision. N.J. Div. of Youth & Family Servs. v. F.M., 211 N.J. 420, 448-49 (2012) (citing N.J. Div. of Youth & Family Services v. E.P., 196 N.J. 88, 104 (2008)).

Title 9 defines an "abused or neglected child" as "a child less than [eighteen] years of age whose parent or guardian . . . commits or allows to be committed an act of sexual abuse against the child[.]" N.J.S.A. 9:6-8.21(c)(3). The burden is on the Division to prove abuse or neglect by a preponderance of the "competent, material and relevant evidence[.]" N.J.S.A. 9:6-8.46(b); N.J. Dep't of Children & Families v. A.L., 213 N.J. 1, 22 (2013).

The Legislature has defined "sexual abuse" to mean "contacts or actions between a child and a parent or caretaker for the purpose of sexual stimulation of either that person or another person[,]" and includes,

> (a) the employment, use, persuasion, inducement, enticement, or coercion of any child to engage in, or assist any other person to engage in, any sexually explicit conduct or simulation of such conduct; (b) sexual conduct including molestation, prostitution, other forms of sexual exploitation of children, or incest; or (c) sexual penetration and sexual contact as defined in N.J.S.[A.] 2C:14-1 and a prohibited sexual act as defined in N.J.S.[A.] 2C:24-4.
>
> [N.J.S.A. 9:6-8.84.]

Pursuant to N.J.S.A. 9:6-8.21(a), a "[p]arent or guardian" means "any . . . paramour of a parent, or any person, who has assumed responsibility for the care, custody, or control of a child or upon whom there is a legal duty for such care."

A court does not have to wait until a child is actually harmed before it can act in that child's welfare. N.J. Div. of Youth & Family Servs. v. V.M., 408 N.J. Super. 222, 235-36 (App. Div. 2009) (Carchman, P.J.A.D., concurring) (citing In re Guardianship of D.M.H., 161 N.J. 365, 383 (1999)). Nor does harm inflicted by a defendant need to be intentional in order to substantiate a finding of abuse or neglect. M.C. III, 201 N.J. at 344.

A-3290-16T2

In finding neglect, the court must base its determination on the totality of the circumstances. N.J. Div. of Youth & Family Servs. v. V.T., 423 N.J. Super. 320, 329 (App. Div. 2011). A finding of neglect must be based on the preponderance of the evidence. N.J.S.A. 9:6-8.46(b); N.J. Div. of Youth & Family Servs. v. G.M., 198 N.J. 382, 398 (2009).

It is undisputed that Alice, based on her status in the household, qualified as a "parent or guardian" under N.J.S.A. 9:6-8.21(a). Given Alice's statutory status and the proofs adduced during the hearing relative to the acts of sexual abuse, we discern no error in the determination that Alice's conduct constituted abuse or neglect.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION