**RECORD IMPOUNDED**

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1741-18T3

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

      Plaintiff-Respondent,

v.

S.R.,

      Defendant-Appellant/
Cross-Respondent,

and

R.R.,

      Defendant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF Me.R., a Minor,

      Respondent/Cross-Appellant,

and

Ma.R.,

a Minor.

Submitted March 3, 2020 – Decided March 23, 2020

Before Judges Accurso, Gilson and Rose.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Monmouth County, Docket No. FG-13-0038-18.

Joseph E. Krakora, Public Defender, attorney for appellant/cross-respondent (Robyn A. Veasey, Deputy Public Defender, of counsel; Anna F. Patras, Designated Counsel, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for respondent/cross-appellant (Margo E.K. Hirsch, Designated Counsel, on the brief).

Gurbir S. Grewal, Attorney General, attorney for respondent (Melissa H. Raksa, Assistant Attorney General, of counsel; Christina Anne Duclos, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minor (Linda Vele Alexander, Designated Counsel, on the brief).

PER CURIAM

Defendant S.R. appeals a Family Part judgment terminating her parental rights to her two daughters, Me.R. (Meredith), born in March 2004, and Ma.R.

(Mary), born in April 2006.[1]  The same judgment also terminated the parental rights of the children's biological father, R.R. (Ralph), who is not a party to this appeal.[2]

On appeal, defendant seeks reversal of the judgment, contending the Division of Child Protection and Permanency failed to establish the four prongs of the "best interests of the child" standard, N.J.S.A. 30:4C-15.1(a), by clear and convincing evidence.  Alternatively, she seeks a remand, claiming the trial court failed to set forth sufficient findings of fact and conclusions of law as required by Rule 1:7-4(a).  Meredith's law guardian cross-appeals, seeking the same relief as defendant.[3]  Mary's law guardian supported termination before the trial court

_____

[1]  We use initials and pseudonyms to protect the privacy of the children, see R. 1:38-3(d)(12), and for ease of reference.

[2]  The couple's sons, E.R. (Eric), and J.R. (Jack), were not named as parties in the guardianship action because Eric had reached the age of majority and Jack had been placed in the legal custody of defendant's mother.  While the appeal was pending, Jack reached the age of majority.

[3]  At the time of the guardianship trial, Meredith had been placed in a pre-adoptive home in Wisconsin.  In January 2019, while this appeal was pending, Meredith was removed from that placement and now resides in a resource home in New Jersey.  Thereafter, Meredith's law guardian filed the present cross-appeal.

A-1741-18T3

and, on appeal, joins the Division in urging us to affirm. Having considered the parties' arguments in light of the record and controlling law, we affirm.

I.

To place the legal issues in context, we set forth in some detail the facts and procedural history from the testimony adduced at trial and the voluminous record before the trial court.[4]

To support its claim that defendant's parental rights should be terminated, the Division presented the testimony of the two caseworkers, who were successively assigned to the family after the children's removal; an adoption supervisor, who testified about the select home adoption process; and David Brandwein, Psy.D., the Division's expert, who performed psychological evaluations of, and a bonding evaluation between, defendant and the girls. The Division also introduced in evidence more than thirty documents, including the caseworkers' extensive reports; Dr. Brandwein's reports; medical records of defendant and the children; defendant's drug tests; and rule-out letters. Defendant neither presented documentary evidence nor called any witnesses.

---

[4] Defendant's appendix on appeal includes thirty volumes, containing more than 5,000 pages of documents.

A-1741-18T3

Her testimony was limited to Meredith's then placement in Wisconsin.[5]  The trial court interviewed both girls in camera pursuant to Rule 5:12-4(b).  The trial spanned four non-consecutive days during September, October, and November 2018.

The family first came to the Division's attention in August 2010, when Meredith was six years old and Mary was four.  Allegations that the children were inadequately supervised and the home was unkempt were unfounded.  Similar referrals followed over the next six years, but none of the allegations was substantiated.

Relevant to this appeal, during a substance abuse evaluation arranged by the Division in July 2013, defendant tested positive for benzodiazepines, oxycodone, buprenorphine (the active ingredient in Suboxone), and opiates.  Defendant denied illegal drug use and ingesting Suboxone, claiming her doctor had prescribed Xanax (a benzodiazepine), Percocet, and Fentanyl on an "as needed" basis the previous year.  But, the doctor told the Division he only had prescribed Xanax.  Diagnosed with opioid abuse, defendant was recommended for intensive outpatient treatment.  She agreed to attend a program but failed to

---

[5]  Defendant testified that Meredith wished to return to this State to be near her friends and family.  As noted above, the Division has returned Meredith to New Jersey, thereby rendering that issue moot.

follow through. The Division sought an order compelling defendant to comply, but the court denied the Division's request for care and supervision of the family.

Nearly two years later, in April 2015, defendant again tested positive for benzodiazepines and opioids. The Division referred defendant for a substance abuse evaluation, but she neither completed the evaluation nor submitted additional urine samples. Two months later, defendant tested positive for similar substances and declined to complete a substance abuse evaluation.

The precipitating event that led to the guardianship complaint occurred in March 2016, when Mary told a school worker she had accompanied her father to his friend's house "to get his medicine." According to Mary, her father and his friend sat in a car "for [ten] minutes" and took "the same medicine." Mary believed her father had ingested "Xany," but she was not sure. Mary said her father brought the "medicine back home to share with" defendant. She said her parents usually took the medicine at nighttime, but she also saw them "cut the medicine in the morning and take a little." Mary was afraid; she did not want her parents to get in trouble or go to jail.

Mary repeated the same account to the Division, adding she had seen her parents crush "Xanies, greens and blues," and use a straw to "slurp" their medication; on one occasion, Mary saw her parents "use their nose" to do so.

Mary did not feel safe at home. She was angry with her parents for taking too much medication because it made them tired and cancel after-school plans with her. Meredith denied her parents used illegal drugs, but said their medication made them drowsy. The children reiterated the same accounts during their interviews with law enforcement.

Both parents were charged with child endangerment and detained in the county jail.[6] Although defendant acknowledged she had abused Xanax in the past, she denied illegal drug use at the time of the removal. Defendant claimed she had been prescribed Xanax for a seizure she had suffered during the prior year, but she failed to produce a Xanax prescription or pill bottle.

By the time of the guardianship trial, the Division had investigated and ruled out four maternal relatives and a family friend as potential placements for the girls, whose placements changed repeatedly after their removal. During the first year, Meredith and Mary were placed together in four different resource homes. In April 2017, however, the girls experienced significant health issues: Meredith underwent a cardiac ablation to correct supraventricular tachycardia; Mary was diagnosed with Type I diabetes following a nine-day hospitalization for diabetic ketoacidosis. Meredith and Mary have not lived together since that

---

[6] Apparently, criminal charges against both parents were dismissed.

A-1741-18T3

time. Meredith was placed in three different resource homes after a short stay in a shelter following her hospitalization; Mary was placed in a regular resource home after a three-month stay at two medical group homes following her hospitalization.

During its many years of involvement with the family, the Division offered numerous services to defendant, attempting to remediate the substance abuse issues that led to the removal of her children. Those services included referrals for substance abuse evaluations and treatment; psychiatric and psychological evaluations and treatment, including in-home therapy; and parent mentoring services. The Division provided transportation when needed.

Defendant was mostly non-compliant with the services offered. Between July 2016 and November 2017, defendant missed nearly twenty substance abuse evaluations. She tested positive on six occasions for various substances, such as benzodiazepines; opiates, including morphine; and opioids, including heroin and oxycodone. As she did prior to the removal, defendant attributed her positive drug test results to her prescribed medication. Defendant refused to comply with recommended inpatient substance abuse treatment, and failed to complete an intensive outpatient program that she had selected. She was

discharged from a Division-recommended individual therapy services program for noncompliance, then failed to attend another program that she had selected.

The Division facilitated weekly therapeutic and supervised visitation with Meredith and Mary, which often took place three times per week. The first caseworker testified defendant generally was compliant and consistently available for visits when they occurred in the home where she resided with her grandparents. But after visits were moved to the community, "there were more cancellations or no-shows." Defendant typically attributed missed visits to her seizures and other medical issues, or Ralph's hospitalizations.

According to the caseworkers, defendant appeared to be under the influence of substances during more than a dozen visitations. For example, defendant was "blinking slowly and deliberately . . . and looking around the room wildly" during a visit in April 2017. Thereafter, she refused the caseworker's request for a drug screen. Four months before the commencement of trial, defendant similarly appeared to be under the influence during a doctor's appointment for Mary.

The first caseworker also testified about the Division's concerns that defendant repeatedly provided the children with "sweets, candy, soda, [and] fast food" during visitations, even though she was aware of the girls' dietary

restrictions. For example, during a visit, defendant offered Mary an ice cream cone, which caused the child to cry and remind defendant she was unable to eat ice cream. Similarly, after Meredith's cardiologist had advised she could not consume chocolate or caffeine pending the cardiac ablation procedure, defendant offered Meredith a chocolate bar and chocolate ice cream, which upset Meredith.

Dr. Brandwein evaluated defendant on two separate occasions.[7] He opined defendant was unable to safely parent her daughters due to her substance abuse and failure to comply with the Division's services. He found defendant's insight and judgment were poor because "she was loath to accept any responsibility for her own behavior and denied, minimized, and rationalized the incidents that have led to her children remaining in the Division's custody for over two years."

Dr. Brandwein's diagnostic impression of defendant included:

- Major Depressive Disorder, recurrent, moderate, with anxious distress, with panic attacks
- Anxiolytic Use Disorder, severe
- Opioid Use Disorder, severe

---

[7] Because defendant arrived late for her appointment, Dr. Brandwein could not complete her evaluation in one visit. He testified defendant's level of anger and irritation at the caseworker – who was unable to drive defendant home from the appointment – was "highly inappropriate" and "off the charts" in the presence of her daughters.

- Paranoid and Dependent Personality Patterns

He opined defendant's diagnoses of severe anxiolytic use disorder and severe opioid use disorder impaired her ability to care for her daughters. Dr. Brandwein explained a "diagnosis of severe anxiolytic use disorder" is the need "to take more and more . . . medication to feel [its] effect," which impacts the person's functioning and leads to "vocational, familial or legal problems."

Although Dr. Brandwein observed the Division had offered defendant "a variety of services to address these conditions," he found she had not engaged in any of those services "in a meaningful way" and "presented with an open mistrust of her service providers, seeking to change them when they d[id] not see things her way" or "after she was confronted by them about her own behavior." He believed additional services likely would have been met "with the same fate as previous services" because defendant demonstrated "little to no propensity for behavior change." Defendant's resistance to services suggested she was "more interested in using substances than parenting" her daughters.

In sum, Dr. Brandwein stated defendant

> denie[d] substance-related problems that are . . . quite easy to see based upon the results of her urine screenings (repeated positives for morphine, likely related to heroin use); show[ed] little motivation to stop taking habit-forming medication; and ha[d] been non-compliant with her medication regimen for a seizure

disorder.  Additionally, [she] blame[d] everyone else but herself for the reasons her children have not yet returned to her care, including [Ralph] and the Division, and seem[ed] painfully averse to the kind of introspection that could produce behavior change.

Dr. Brandwein found Meredith and Mary were bonded to defendant and clearly viewed her as their mother "from a physical and psychological perspective."  Due to their multiple placements, neither child had developed "a relationship with other adult caregivers that, from a psychological perspective, could approximate or substitute for the parental relationship."  Nonetheless, Dr. Brandwein opined that the "health of the bond" with defendant was "quite poor" and the girls' relationship with defendant was "co-dependent, unhealthy, and based on a view of [defendant] that conforms more with fantasy than reality."  Importantly, the doctor determined defendant prioritized her own needs over those of her daughters.

Dr. Brandwein expressed his support for select home adoption because defendant had "clearly chosen illegal drug use and/or habit-forming prescription medications over being reunified" with the children, and nothing had changed since their removal "two years and eight months" prior to his evaluation.  He noted "both girls appear to want their parents, from a physical and psychological perspective, more than their parents want them."  Although he acknowledged

that "some harm" would befall the girls if they no longer had any contact with defendant, Dr. Brandwein opined "more harm w[ould] be done by these children waiting for . . . defendant to be the parent she need[ed] to be for these girls."

Notably, Dr. Brandwein said Meredith and Mary were the most resilient children he had ever evaluated. "They have persisted and maintained hope for the future even though they have moved from place-to-place, been subjugated to second place by their parents due to their parents' drug use, and dealt with serious medical issues." Both girls were "very intelligent." They "ha[d] age-appropriate interests, age-appropriate insight and judgment, and express[ed] themselves and their wishes quite skillfully."

In her brief testimony, Meredith told the court she wanted to live with her parents, but she understood the gravity of their drug abuse prevented reunification. Meredith told the court she liked her resource family and felt "good" about the prospect of adoption.[8] She expressed her preference to continue visitation and telephone contact with defendant, even if she were adopted. Meredith preferred the court "make that ultimate decision."

Mary was more vocal about the impact of defendant's noncompliance, and her desire for permanency. Mary told the court she would prefer to live in a

_____

[8] As noted, Meredith is no longer placed in an adoptive home.

13

foster or adoptive home, and continue her visits with defendant. She said visitations mostly went well, but she became "really upset" and "screamed" at defendant during a then recent visit because her mother "was dozing in and out." Mary thought defendant might have had taken "a pill."

Mary acknowledged she had desired to return home "two years" prior, but now that she was "older" she could "express [her]self more and tell the truth and not hide behind saying that, oh, my mom's not doing this, my mom's just tired." Although Mary preferred the court determine permanency, she knew her parents' rights would likely be terminated as a result of their noncompliance. Mary elaborated:

> [I]t's heartbreaking because I thought that they would be the parents that they told me that they would be where they would do what they were supposed to be doing and not lie to me in my face, telling me that they've been going to all the therapy and they haven't used anything, when actually they both have. And you know, it's kind [sic] like hard because they said that they go to therapy and I find out all this and then they don't. It's like you lied to me and you've been lying to me for like two, three years, so maybe longer than that, so.
>
> . . . .
>
> I know that I won't make the same mistakes as my parents will and I hope that they really do get their act together. I mean, . . . I do want to live in a home that I can actually . . . call home and that they won't lie

> straight in my face, telling me things that it's [sic] not true. So I know that I really want a family that I can really call my mom and dad and not be like this is my mom but she uses stuff, this is my dad but he uses drugs. Like I don't want to say that. I want to say this is my mom and she does the right things, or this is my dad and he does the right things.

Mary expressed fear of another removal if she were reunited with defendant and she started using drugs again.

The adoption supervisor explained select home adoption is a permanency goal available for children who are not placed in a resource home that is willing to adopt. As of September 2018, the Division had identified two Division-licensed adoptive homes in New Jersey that were willing to accept children with similar ages and medical and other needs as Meredith and Mary. If in-state placement efforts proved unsuccessful, the Division would then expand its search to include out-of-state adoptive homes following termination of parental rights when the children were considered "legally free."

According to the adoption supervisor, Meredith did not have any special needs or diagnoses and performed "well in school . . . behaviorally and emotionally." Mary has some special needs, having been diagnosed with adjustment disorder, attention deficit/hyperactivity disorder, and Type I diabetes. But, Mary managed her diabetes independently and her medical

diagnosis would not be a barrier to locating an adoptive home. Acknowledging "[i]t's not easy" to find adoptive homes for teenagers, the adoption supervisor maintained it also was not impossible. She has had success finding adoptive homes for fourteen-year-old girls like Meredith, and twelve-year-old girls with special needs comparable to Mary's.

Following summations, the trial judge issued an oral decision and the judgment under review. These appeals followed.

## II.

The applicable law is well established. It is axiomatic that parents have a constitutionally protected right to the care, custody, and control of their children. N.J. Div. of Youth & Family Servs. v. F.M., 211 N.J. 420, 447 (2012). But that right is not absolute. N.J. Div. of Youth & Family Servs. v. R.G., 217 N.J. 527, 553 (2014). "It is a right tempered by the State's parens patriae responsibility to protect children whose vulnerable lives or psychological well-being may have been harmed or may be seriously endangered by a neglectful or abusive parent." F.M., 211 N.J. at 447. At times, a parent's interest must yield to the State's obligation to protect children from harm. N.J. Div. of Youth & Family Servs. v. G.M., 198 N.J. 382, 397 (2009). Importantly, "[c]hildren must not languish indefinitely in foster care while a birth parent attempts to correct the conditions

that resulted in an out-of-home placement." <u>N.J. Div. of Youth & Family Servs. v. S.F.</u>, 392 N.J. Super. 201, 209 (App. Div. 2007).

To effectuate those concerns, the Legislature created a test for determining whether a parent's rights must be terminated in the child's best interests. N.J.S.A. 30:4C-15.1(a) requires that the Division prove the following four prongs by clear and convincing evidence:

> (1)   The child's safety, health, or development has been or will continue to be endangered by the parental relationship;
>
> (2)   The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from his resource family parents would cause serious and enduring emotional or psychological harm to the child;
>
> (3)   The [D]ivision has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and
>
> (4)   Termination of parental rights will not do more harm than good.

The four prongs are not independent of one another. <u>N.J. Div. of Child Prot. & Permanency v. T.D.</u>, 454 N.J. Super. 353, 379 (App. Div. 2018). Rather,

17

they "are interrelated and overlapping" and "designed to identify and assess what may be necessary to promote and protect the best interests of the child." N.J. Div. of Youth & Family Servs. v. R.L., 388 N.J. Super. 81, 88 (App. Div. 2006). Parental fitness is the crucial issue. In re Guardianship of K.H.O., 161 N.J. 337, 348 (1999). Determinations of parental fitness are fact sensitive and require specific evidence. Ibid.

Our review of a judgment terminating parental rights is limited. R.G., 217 N.J. at 552. "[T]he trial court's factual findings should be upheld when supported by adequate, substantial, and credible evidence." Ibid. This is because "the trial court . . . has the opportunity to make first-hand credibility judgments about the witnesses who appear on the stand" and because "it has a 'feel of the case' that can never be realized by a review of the cold record." N.J. Div. of Youth & Family Servs. v. E.P., 196 N.J. 88, 104 (2008) (quoting N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 293 (2007)). "When the credibility of witnesses is an important factor, the trial court's conclusions must be given great weight and must be accepted by the appellate court unless clearly lacking in reasonable support." N.J. Div. of Youth & Family Servs. v. F.M., 375 N.J. Super. 235, 259 (App. Div. 2005).

We recognize the "special expertise" of the Family Part "by virtue of its specific jurisdiction." R.G., 217 N.J. at 553. "Only when the trial court's conclusions are so 'clearly mistaken' or 'wide of the mark' should an appellate court intervene and make its own findings to ensure that there is not a denial of justice." E.P., 196 N.J. at 104 (quoting N.J. Div. of Youth & Family Servs. v. G.L., 191 N.J. 596, 605 (2007)). That said, "[a] trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference." Manalapan Realty, LP v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995).

## III.

## A.

At the outset, we reject the arguments advanced by defendant and Meredith's law guardian that we must vacate the judgment because the trial court failed to comply with Rule 1:7-4(a). Although the trial court's findings of fact and conclusions of law were anomalously terse, those shortcomings are not fatal to our meaningful review or to the underlying judgment. See N.J. Div. of Child Prot. & Permanency v. M.C., 456 N.J. Super. 568, 588 (App. Div. 2018).

"In a non-jury civil action, the trial court shall make findings of fact and state its conclusions of law." N.J. Div. of Youth & Family Servs. v. M.C. III,

201 N.J. 328, 342 (2010). "[T]he trial court must state clearly its factual findings and correlate them with the relevant legal conclusions." Curtis v. Finneran, 83 N.J. 563, 570 (1980). "Failure to make explicit findings and clear statements of reasoning 'constitutes a disservice to the litigants, the attorneys, and the appellate court.'" Gnall v. Gnall, 222 N.J. 414, 428 (2015) (quoting Curtis, 83 N.J. at 569-70). Ordinarily, non-compliance with Rule 1:7-4(a) would impede "meaningful appellate review." M.C., 456 N.J. Super. at 588.

While the trial court's oral decision could have been more organized and detailed, it referenced the controlling legal standard, addressed the key facts in evidence, and adequately correlated those facts with its legal conclusions. The court also made credibility determinations about the unrefuted testimony of the Division's expert witness that warrant our deference. F.M., 375 N.J. Super. at 259. Further, we agree with the Division and Mary's law guardian that there is ample evidence in the record to support each prong of the best interests test. See F.M., 211 N.J. at 448. Accordingly, our review of the court's decision is not hampered. M.C., 456 N.J. Super. at 588.

Prongs I and II

We first consider defendant's argument that her positive drug test results were insufficient evidence to support the court's prong one conclusion, and "a delay in permanency is an insufficient basis for making a prong two determination." Similarly, Meredith contends the Division failed to prove she was endangered by defendant or would continue to be harmed if returned to defendant's care. Meredith also claims defendant's "complex medical problems resulted in her inability to complete all the tasks required within the strictures of the law," and the Division "failed to present any data to support the contention that select home adoption would lead to permanency." We reject these contentions.

Relevant here, "[w]hen the condition or behavior of a parent causes a risk of harm, such as impermanence of the child's home and living conditions, and the parent is unwilling or incapable of obtaining appropriate treatment for that condition, the first subpart of the statute has been proven." N.J. Div. of Youth & Family Servs. v. H.R., 431 N.J. Super. 212, 223 (App. Div. 2013); see also N.J. Div. of Youth & Family Servs. v. L.M., 430 N.J. Super. 428, 444 (App. Div. 2013) (holding that a parent's "continued drug use, lack of appropriate

housing, and failure to attend treatment, clearly posed a risk to the children" and satisfied prong one of the best interests test).

The second prong "relates to parental unfitness," K.H.O., 161 N.J. at 352. "[T]he inquiry centers on whether the parent is able to remove the danger facing the child." F.M., 211 N.J. at 451. This prong is satisfied "by demonstrating that the parent has not cured the problems that led to the removal of the child." H.R., 431 N.J. Super. at 224. "In other words, the issue becomes whether the parent can cease causing the child harm before any delay in permanent placement becomes a harm in and of itself." N.J. Div. of Youth & Family Servs. v. A.G., 344 N.J. Super. 418, 434 (App. Div. 2001); see also N.J. Div. of Youth & Family Servs. v. P.P., 180 N.J. 494, 512 (2004) (holding that prong two was proven by clear and convincing evidence where the parents had "significant and long-standing substance abuse histories," repeatedly failed "to comply with DYFS recommendations and court orders for services," and "were not in a position to care for their children" at the time of trial).

As is often the case, the trial court's findings regarding the first prong, here, informed and overlapped the second. See R.L., 388 N.J. Super. at 88. The court's prong one and prong two findings not only focused on defendant's "severe and pervasive drug problems," but also her repeated positive drug tests

during the litigation, and her noncompliance with Division-offered drug treatment, including the failure to commence recommended inpatient treatment.

To support its findings, the court cited Dr. Brandwein's unrefuted testimony – which it deemed "very, very credible" – that defendant was not capable of parenting. The court noted defendant failed to realize she had substance abuse problems and instead opted to blame others for the Division's involvement. Given defendant's history of noncompliance, the court determined "the likelihood that [she is] going to change and start doing something now at this particular point is just unrealistic for any court to expect." As detailed above, the record is replete with evidence supporting the court's decision. See P.P., 180 N.J. at 512.

Moreover, Meredith's focus on the "actual harm" component of prong one is misplaced. It is well settled that the Division need not demonstrate actual harm to satisfy prong one. A.G., 344 N.J. Super. at 440; see also In re Guardianship of D.M.H., 161 N.J. 365, 383 (1999) ("Courts need not wait to act until a child is actually irreparably impaired by parental inattention or neglect."). As is the case here, the harm may be established by "a delay in establishing a stable and permanent home." D.M.H., 161 N.J. at 383.

## Prong III

Turning to prong three, neither defendant nor Meredith argue the Division failed to address defendant's substance abuse problems, but they assert many of the "services" provided by the Division, "such as case[-]planning services, evaluation and visitation," were "simply" part of its "job." They claim the Division failed to assist defendant with managing her seizure disorder. Defendant also claims the court failed to address kinship legal guardianship [KLG] as an alternative to termination of parental rights. Their arguments are unavailing.

The third prong of the best interests test requires the Division to make diligent efforts to reunite the family. K.H.O., 161 N.J. at 354. Reasonable efforts vary with the circumstances. R.G., 217 N.J. at 557. Those efforts generally include consulting with the parents, developing a reunification plan, providing services to support the reunification effort, and facilitating visitation. M.M., 189 N.J. at 281. Parents must actively participate in the reunification plan through "genuine and successful efforts to overcome the cause of the removal." N.J. Div. of Youth & Family Servs. v. A.R., 405 N.J. Super. 418, 437 (App. Div. 2009). "The diligence of [the Division's] efforts on behalf of a parent is not measured by their success." D.M.H., 161 N.J. at 393.

24

We recognize the trial court summarily stated its findings concerning the Division's reasonable efforts to provide services. Nonetheless, as detailed above, the record fully supports the multitude of services offered to defendant to address her substance abuse issue. Those efforts were sufficiently tailored to "provide services to help [defendant] correct the circumstances which led to the child[ren]'s placement outside the home." N.J.S.A. 30:4C-15.1(a)(3); M.M., 189 N.J. at 285. Those circumstances pertained to defendant's substance abuse, not her seizures. Significantly, the record is devoid of any evidence that defendant requested assistance obtaining treatment for her seizures or that they interfered with her ability to parent. Indeed, defendant had medical insurance and was treating with various neurologists during the pendency of the litigation.

Little need be said concerning defendant's argument that the trial court failed to consider KLG where, as here, the Division investigated defendant's preference that her friend become the girls' kinship legal guardian. The Division, however, ruled-out defendant's friend because he lacked housing and self-reported he was "not stable." As mentioned above, the Division also ruled out four maternal relatives. Accordingly, this is not a case in which the Division "ha[d] been lax or capricious in its assessment of . . . timely-presented alternative caretakers." N.J. Div. of Youth & Family Servs. v. J.S., 433 N.J.

Super. 69, 87 (App. Div. 2013). Because no one was available to serve as a kinship legal guardian for Meredith and Mary by the time of trial, we discern no error in the court's failure to consider KLG as an alternative to termination of parental rights. See E.P., 196 N.J. at 105 (quoting P.P., 180 N.J. at 508-09) ("Although a court may appoint a kinship legal guardian when adoption of the child is neither 'feasible nor likely,' . . . at the end of the family court hearings, there was no person available to serve as a kinship legal guardian.").

Prong IV

Addressing the fourth prong, defendant contends the court overlooked the bond between her and the girls, their desire to return home, and the uncertainties inherent in the select home adoption process. Meredith asserts "it defies logic to argue that severing a teenager's only bond [with her mother] would not do more harm than good" given the child's desire for reunification.

The fourth prong "is related to the first and second elements of the best interest standard, which also focus on parental harm to the children," D.M.H., 161 N.J. at 384, and "serves as a fail-safe against termination even where the remaining standards have been met." E.P., 196 N.J. at 108. "[A] child's need for permanency is an extremely important consideration pursuant to this prong." R.G., 217 N.J. at 559.

26

Where, as here, termination of parental rights is predicated upon the parent's unfitness and not the child's strong bond with a resource family, the salient inquiry under prong four involves consideration of the children's need for permanency and the parent's ability – or inability – to provide the children with a safe and stable home "in the foreseeable future." N.J. Div. of Youth & Family Servs. v. B.G.S., 291 N.J. Super. 582, 593 (App. Div. 1996). But, "[a] court should hesitate to terminate parental rights in the absence of a permanent plan that will satisfy the child's needs." Ibid.; see also N.J. Div. of Youth & Family Services v. A.W., 103 N.J. 591, 611 (1986) (citation omitted) (acknowledging the "unfortunate truth that not all children, who are 'freed' from their legal relationship with their parents, find the stable and permanent situation that is desired even though this is the implicit promise made by the state when it seeks to terminate the parent-child relationship").

Moreover, in E.P., our Supreme Court reversed termination of a mother's parental rights to her twelve-year-old daughter that "was based in large part on the mother's addiction to drugs, psychological problems, and unstable lifestyle." 196 N.J. at 92. The Court concluded the Division had not proven "by clear and convincing evidence that termination would not do more harm than good," even though it had met its burden under prongs one, two, and three. Id. at 110-11.

27

The Court noted the mother and daughter were bonded, and there was "no prospect of the daughter's adoption on the horizon." Id. at 92. Importantly, however, the mother in E.P. was "on a rehabilitative path--free of drugs for some time, gainfully employed, and with stable housing." Ibid.

In support of its prong four conclusion, the court cited Dr. Brandwein's testimony – unrebutted on this record – that termination of parental rights would not do more harm than good, even in the face of select home adoption. The court acknowledged the girls were bonded to defendant, but accepted Dr. Brandwein's opinion that the bond was unhealthy. Given the girls' positive qualities and maintenance of their medical issues, the court concluded select home adoption was feasible. Dr. Brandwein's assessment concerning the girls' resilience supports the court's finding. The court also appropriately considered the children's wishes, although not dispositive, as expressed during the in camera interviews. E.P., 196 N.J. at 113 (explaining that when analyzing the fourth prong, it is appropriate for the court to consider "the wishes of a child over the age of ten, who has reached a level of maturity that allows the child to form and express an intelligent opinion" while remaining "mindful that children's wishes may often not be in their own best interests"). The court recognized Meredith desired to return home, but also noted both girls were

realistic and open to the plan of adoption if they could not be reunified with defendant.

The record supports the court's implied conclusion that, due to her untreated substance abuse issues, defendant was either unwilling or unable to provide a safe and stable home for Meredith and Mary "in the foreseeable future," B.G.S., 291 N.J. Super. at 593, and could not provide the girls with the permanency to which they are entitled. Unlike the mother in E.P., 196 N.J. at 92, defendant was not drug free at the time of the guardianship trial. As stated above, Dr. Brandwein supported select home adoption under the circumstances of this case, and the adoption supervisor discussed the efforts the Division would make to find adoptive homes for the girls as soon as they are "legally free."

We acknowledge the evidence supporting the fourth prong presents a closer call than the other three prongs. But, we have also recognized "[a] child cannot be held prisoner of the rights of others, even those of . . . her parents. Children have their own rights, including the right to a permanent, safe and stable placement." N.J. Div. of Youth & Family Servs. v. C.S., 367 N.J. Super. 76, 111 (App. Div. 2004). While termination of defendant's parental rights does not guarantee Meredith and Mary will achieve permanency through select home adoption, a reversal in this case would surely relegate the children to a limbo

status antithetical to their right to a permanent home. Contrary to the arguments advanced by defendant and Meredith, neither the girls' bond with defendant – including Meredith's desire to reunify with her – nor the uncertainties inherent in the select home adoption process, warrants reversal when viewed in context of the evidence in the trial record that supports termination.

\* \* \*

In sum, while we do not endorse the trial court's rambling discussion of the trial evidence, we are convinced by our own independent assessment of the record that its conclusions are "supported by substantial and credible evidence on the record" and thus entitled to our deference. F.M., 211 N.J. at 448 (citations omitted).

To the extent we have not specifically addressed the remaining arguments advanced by defendant and Meredith, we conclude they lack sufficient merit to warrant discussion in our written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1741-18T3